2022 IL App (1st) 182604

SIXTH DIVISION
Filing Date March 31, 2022

No. 1-18-2604

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| | ) | Cook County. |
| v. | ) | |
| | ) | No. 07 CR 25224 |
| ALEX DANIEL, | ) | |
| | ) | The Honorable |
| Defendant-Appellant. | ) | Carl B. Boyd, |
| | ) | Judge, Presiding. |

_____

JUSTICE ODEN JOHNSON delivered the judgment of the court, with opinion.
Presiding Justice Pierce and Justice Harris concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a jury trial, defendant Alex Daniel was convicted of the first degree murder of his wife, Brenda Daniel (decedent), and personal discharge of a firearm. He was sentenced to an aggregate 65-year prison term, 40 years for murder with a 25-year enhancement for personal discharge of a firearm. Defendant raises six issues on appeal: (1) he was not proven guilty beyond a reasonable doubt where the State presented no competent evidence showing that he was home when  decedent was shot; (2) the trial court erred when it allowed the introduction

of an audio recording obtained from the marital home found by decedent's son after the shooting; (3) he was denied a fair trial where the State argued facts not in evidence during closing arguments and violated the trial court's pretrial evidentiary rulings during trial by eliciting prejudicial testimony; (4) the trial court abused its discretion where it allowed evidence of a prior domestic violence incident under section 115-7.4 (725 ILCS 5/115-7.4 (West 2016)) of the Code of Criminal Procedure (Code) where the incident involved conduct that was factually dissimilar to the charged offense and its prejudicial effect outweighed any probative value; (5) the trial court violated defendant's sixth amendment right to represent himself when it forced him to choose between proceeding *pro se* and engaging an expert witness that was necessary to his defense; and (6) the trial court erred when it failed to conduct an inquiry into defendant's *pro se* claim of ineffective assistance of counsel in his posttrial motion for new trial, pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984). Oral argument was held on March 10, 2022. For the reasons that follow, we affirm.

¶ 2                                          I.  BACKGROUND

¶ 3        The circumstances of this case stem from the May 23, 2007, shooting of decedent at the parties' residence located at 717 Oxford in Matteson. Police responded to a 911 hang-up call made from the residence and found her lying unresponsive in the dining room at approximately 9:30 a.m. Decedent was transported to the hospital, where she died from her injuries the following day. Defendant was subsequently arrested on October 17, 2007, after being located in Milwaukee, Wisconsin.

¶ 4                                    A. Pretrial Proceedings

¶ 5        Prior to trial, both sides filed motions seeking evidentiary rulings by the trial court.[1]

¶ 6        The record indicates that defendant filed several motions to suppress an audio recording that was allegedly found in the residence after decedent's death. Defense counsel first filed a motion to suppress the recording on June 11, 2009, on the basis that the State was unable to lay a proper foundation for its admission. The trial court ordered the State to have the device tested to determine when the recording was made and to proffer how it would satisfy the other requirements necessary to lay a foundation for its admissibility. The State subsequently sent the device to the Federal Bureau of Investigation (FBI) for testing, and a report was received on September 30, 2011. The trial court made preliminary rulings on January 25, 2012, after hearing the recording: (1) barring the State from eliciting testimony from decedent's children confirming that it was decedent's voice on the recording; (2) finding that it was relevant; (3) finding that the foundation for admissibility was established by the FBI's indication that there was no tampering with the device or the recording; and (4) ruling that the recording could be presented for its weight. The trial court also indicated that the State must establish a proper foundation as to how the police gained possession of the recording device and if that was not presented sufficiently, the evidence would not come in.

¶ 7        On November 18, 2011, defense counsel filed a motion to suppress a spiral notebook recovered from the residence on the basis that it was the product of an illegal search. The trial court denied the motion, finding that it was subject to the inevitable discovery rule.

¶ 8        The next motion to suppress was filed by defense counsel on September 10, 2012, and challenged the admissibility of the recording under the eavesdropping statute (720 ILCS 5/14-

---

[1] Defendant's case was originally assigned to Judge Zelezinski until January 2017, then to Judge Boyd beginning in February 2017, who conducted defendant's trial.

1 *et seq.* (West 2012)) because defendant did not consent to recordings of his conversations with the decedent. The trial court denied the motion.

¶ 9 Defendant's jury trial was originally scheduled to begin on June 17, 2014. However, on April 8, 2014, defendant filed a motion for the appointment of counsel other than the Public Defender's Office, which the trial court denied. On May 15, 2014, defendant presented a written motion to proceed *pro se*. He also filed motions to suppress the recording and to inspect the recording device, which were both denied by the trial court. The court admonished defendant under Supreme Court Rule 401 (eff. July 1, 1984) and granted his request for self-representation on June 3, 2014. On June 19, 2014, defendant requested to view the notebook that was taken from the residence and additionally requested the recording device, tapes, and batteries. He also requested transcripts of the audio recording and all court proceedings to date on August 25, 2014, by filing a motion to compel the State's Attorney's Office to provide these items to him. On August 27, 2014, defendant filed a second motion to suppress the audio recording, which was denied on September 14, 2014. Meanwhile, on September 3, 2014, defendant filed a motion for the assignment of a private investigator and an expert investigator to analyze the capability of the recording device. The hearing on defendant's various motions was continued over several court dates.

¶ 10 The trial court admonished defendant that the case was seven years old and that a trial date had been set prior to his decision to proceed *pro se*. The court stated that it was not a question of his indigency but a matter of his choice to represent himself that placed him in the position of having to prepare for trial and initiate discovery on his own. The trial court further admonished defendant that his indigency entitled him to the services of an attorney who could initiate discovery and investigate on his behalf, but because he chose to represent himself, he

was responsible for securing those services on his own; there was no requirement that the court provide any of those services for him just because he was *pro se*. The State indicated that it would bring a computer and the discs to court so that defendant could listen to the audio recording and view the photos. The State also indicated that it would order the transcript from a previously argued suppression hearing and provide it to defendant. The State reiterated that the entire case file from the Public Defender's Office was tendered to defendant but if there were any documents that defendant felt were not included, the State would make sure he received them so the case could move forward to trial.

¶ 11     Defendant filed a motion to reconsider the denial of his motion for an expert investigator and numerous additional *pro se* motions that were all denied. On April 2, 2015, defendant asked for the public defender to be reappointed because he felt that he was not making any progress in his self-representation. The record reflects that the Public Defender's Office was reappointed to represent defendant on April 10, 2015.

¶ 12     On June 24, 2016, the State filed a motion *in limine* to introduce evidence of a 2003 domestic violence incident between defendant and decedent to show knowledge, identity, and propensity to commit domestic violence offenses pursuant to section 115-7.4 of the Code (725 ILCS 5/115-7.4 (West 2016)). In support of the motion, the State indicated that decedent called the police in 2003, and when they arrived, she had head injuries. Defendant was questioned and a Rossi .38-caliber revolver was found in the residence. Defendant was arrested and the gun was returned to decedent. The State argued that the circumstances of the 2003 incident were similar to the date of the 2007 shooting: the same parties, similar head injuries to decedent, both calls were made in the morning, the same marital residence, and a 911 hang-up call placed both times. The State also noted that the gun, previously found in the marital

bedroom, was missing from the residence in 2007. Defendant challenged the motion, arguing that no gun was found on him in 2003, only bullets, and that he was trying to keep the bullets from decedent. Further, defendant argued that no gun was recovered in the instant case so there was no way of knowing whether the same gun was involved. Defendant also claimed that the motion was based on hearsay evidence from the officers as there were no witnesses besides him and decedent to the prior incident. On July 22, 2016, the trial court ruled that evidence of the prior incident was admissible to show identity and knowledge.

¶ 13    On March 24, 2017, defense counsel filed a motion *in limine* to exclude the audio recording based on the State's alleged discovery violation wherein the State failed to preserve the recorder's memory chip which would have allowed for independent testing by the defense. Defense counsel argued that the FBI damaged the device when it removed the chip, and that the chip later malfunctioned, making it impossible for further testing to be conducted. According to defense counsel, the chip would have had information regarding the dates and lengths of the recordings. Consequently, defense counsel sought to bar admission of the recording as a sanction against the State, which the trial court denied, finding that there was no bad faith by the State, that the recording itself was not the essence of the charge against defendant, and further that no preservation order had been issued.

¶ 14    Defense counsel also filed a motion *in limine* on numerous issues on November 14, 2017. After a hearing, the trial court ruled that the State was precluded from: (1) mentioning that decedent intended to divorce defendant; (2) mentioning defendant's use of alcohol or drugs; (3) referencing any other incident of domestic violence with decedent or any other family members outside of the 2003 incident when defendant was arrested; (4) mentioning that defendant was featured on America's Most Wanted in connection with the case; and, (5)

introducing evidence of defendant's character traits. The trial court reserved its ruling as to whether the State would be allowed to introduce evidence of two 38-caliber live rounds of ammunition found by police at the Gary, Indiana home of defendant's friend, Leon Patterson. Additionally, pursuant to a later motion, the State was precluded from eliciting testimony from the 911 operator that there were multiple prior domestic calls from the residence, but the operator could testify to a firearm on the premises during the 2003 incident.

¶ 15 Defendant subsequently filed a *pro se* motion to dismiss the indictment, which defense counsel did not adopt. The trial court admonished defendant that he was represented by counsel and inquired as to whether he intended to proceed on the motion and to represent himself going forward. The motion was ultimately denied and resulted in defendant's trial date being rescheduled again.

¶ 16                                   B. Defendant's Trial

¶ 17 Defendant's jury trial ultimately commenced on August 7, 2018, after jury selection. Defendant was initially charged with six counts of first degree murder, but the State nol-prossed counts one through four.

¶ 18 Lisa Gryczewski testified that she was employed by SouthCom Dispatch, one of the dispatch centers for Matteson, Park Forest, Olympia Fields, and Richton Park for 13 years. She was working on May 23, 2007, and as part of her job, she took emergency and nonemergency calls. The center where she worked had an enhanced 911 system, meaning that when a call came in, if it was from a landline number, she could see the address, the resident's name, and the GPS coordinates. At approximately 9:25 a.m., Gryczewski received a 911 call from 717 Oxford in Matteson. When she asked what the emergency was, she heard a click. Gryczewski stated that the policy was to "open a call or incident" with any address, so she "opened a

dispatch" and was going to dispatch officers. However, she was unable to dispatch any officers immediately because no one was available, so Gryczewski followed the office protocol and notified the Matteson police supervisor that there was a 911 hang-up call holding, gave him the address, and told him that there were previous calls from that address for domestic. Defense counsel's objection to the implication of multiple prior domestic calls was sustained after a sidebar outside the presence of the jury, and the trial court admonished the jury to disregard the last statement. Gryczewski then testified that some information related to a previous call was associated with that address, and she notified the Matteson police supervisor that there was a previous domestic with a gun. Defense counsel objected and there was a second sidebar held in chambers. Defense counsel argued that the testimony was contrary to the motion *in limine*. The State requested to ask Gryczewski a leading question to cure the error, which the trial court allowed. In the presence of the jury, the trial court sustained the objection and admonished the jury to disregard the last statement regarding a domestic call involving a gun. The State then asked Gryczewski whether the previous domestic call involved a gun on the premises, and she responded affirmatively.

¶ 19   Officer Beck testified that he worked for the Matteson Police Department for 12 years as a patrol officer. On May 23, 2007, he was on patrol when he heard a dispatch call regarding a 911 hang-up at 717 Oxford at approximately 9:29 a.m. Another officer indicated that he was going to that residence, but subsequently requested assistance, so Beck also went to the residence. As Officers Beck and Puklo approached the front door, Puklo told him that the door was unlocked, and they entered the residence. Beck saw a woman lying face down in the dining room. The officers announced their presence and office. When the woman did not respond, Beck radioed for paramedics and other units to assist. He and Puklo stood in the doorway until

assistance arrived to make sure there were no threats inside the residence. Officer Wilson arrived shortly thereafter, and the three officers entered the residence and searched for any other people in the house before paramedics were allowed in. They determined that no one was there besides the victim, who he later learned was decedent. There were no signs of forced entry. Other officers also arrived at the residence, as well as the paramedics, who transported decedent to the hospital. Beck saw no firearm or shell casings near decedent's body or anywhere in the house.

¶ 20      On cross examination, Beck clarified that he never searched the garage although one of the other officers did. He never saw anyone run out of the garage with a gun or anyone speeding past him as he approached the residence. Beck stated that when he entered the residence, he heard decedent moaning. He also stated that he remained at the scene for more than an hour, protecting it until he was relieved by detectives, although he could not recall which detectives arrived first.

¶ 21      Sergeant Robert Wilson testified that he worked with the Matteson Police Department for 23 years, and he was a patrol officer on May 23, 2007, when he responded to the call for backup at 717 Oxford. When he arrived, he entered the residence with Officers Beck and Puklo. He saw decedent lying on the floor with blood around her head and he attempted to communicate with her, but she was unresponsive. Decedent was moving one leg and gasping slightly. When the ambulance arrived, decedent was taken from the residence. Wilson did not see any firearm or shell casings around decedent's body, nor did he see any guns in the residence. He stated on cross examination that he did not search or secure the garage, and that he directed other officers to secure other parts of the premises. Wilson recalled that Officer Brady rode in the ambulance with decedent to the hospital.

¶ 22    Steven Smith testified that in May 2007, he worked as a floor installer for Kingston Tile at Kennedy King College. Defendant was working with him at that time, and he identified defendant in court. Smith was defendant's immediate supervisor and defendant had been working with him for approximately six weeks on that project. He previously worked with defendant off and on several times over the past 10 to 15 years, and defendant called him "Smitty." Smith stated that on May 22, 2007, defendant was going to pick up his check for him and bring it to work the next day. Defendant was scheduled to work at 6 a.m. on May 23, 2007, but he did not show up. Smith called defendant just after 7 a.m. to find out whether he was coming to work. Defendant told him that he would be at work in about an hour, but he never arrived for work that day. Smith stated that he never saw or spoke with defendant again until that day in court. Smith also testified that workers in their field typically had their own tools which were kept at the worksite, and defendant left his tools at the worksite on May 22, 2007. To his knowledge, defendant never came back for his tools, nor did he ever bring Smith's paycheck. Smith subsequently requested a new check. Smith recalled that defendant worked on May 21 and May 22, 2007, and that defendant had recently purchased a green Mountaineer SUV that was giving him trouble. Defendant told Smith that his wife was mad that he purchased the vehicle and told him to take it back. Smith also stated that defendant mentioned that his wife was talking about getting a divorce. During a sidebar outside the presence of the jury, defense counsel objected that Smith's statement regarding divorce violated the motion *in limine*. The trial court sustained the objection and admonished the jury to disregard it. Smith subsequently testified that defendant told him that he was having marital problems. Smith also identified a photo of a green Mountaineer as defendant's SUV.

¶ 23    On cross examination, Smith testified that he called defendant on his cell phone on May 23, 2007. On recross examination, Smith stated that defendant answered his cell phone and that they had a conversation.

¶ 24    Michael Fisher, a computer scientist with the FBI in the Milwaukee field office, testified that he worked for the FBI for 14 years and that he had previously testified in court as an expert in the field of computer data retrieval. The parties stipulated that Fisher was an expert, and the trial court declared him as a computer expert of computer data retrieval.

¶ 25    Fisher received a voice recorder from the Matteson police department while he was working at the FBI lab in Quantico, Virginia (Quantico). He checked it for identifying features before examining it. The recorder had no batteries, so he put new batteries in it. When the unit powered on, "CHK" flashed on the screen, which indicated a memory malfunction, and the unit could not access the data itself. Fisher decided to open the device and physically remove the memory chip from it. He identified in court the Olympus VN 4100 voice recorder that he examined in connection with the case based on the FBI evidentiary markings. Fisher also identified the memory chip that was removed from the device in court, which was housed in an electrostatic bag, based on the FBI markings. In examining the memory chip, Fisher placed it into an electronic device and recovered its data. He explained that the data on the chip came out in a large bin file which he then ran through a tool he and other engineers at Quantico developed to read such files. Fisher was then able to recover 10 recordings and place them onto a compact disc (cd) that could be played through any recording playing tool. Fisher identified the cd containing the converted recordings in court and stated that he listened to the recordings earlier that day. He opined that the recorder was functioning properly when it made the recordings, and that the memory chip and audio recordings were not tampered with or altered

in any way. Fisher made a duplicate copy of the cd to be analyzed by the audio section of the FBI lab and it was forwarded to Kenneth Marr at the lab. Fisher also testified about how the voice recorder functioned. He indicated that it could capture recordings in three ways: by pressing the record button; through voice activation; and by a preset timer. He stated that he did not know what mode was used to capture the recordings, but it was his opinion that when they were made, the recorder was functioning properly, and the files were untampered with. Fisher also stated that besides the chip that he removed from the recorder, the chip and device were in substantially the same condition a when he last worked on them.

¶ 26    Fisher testified on cross examination that he received the recorder in October 2010 from Matteson Officer Arvin and that the scope of his work was to examine the recorder and the recordings and to determine if any tampering took place. Before examining the subject device, Fisher obtained an identical device to test its functionality, its capabilities and what happens when the chip was removed. He stated that there were no timestamps on any of the recordings he retrieved from the subject device, nor was he able to determine the volume level used to activate automatic recording on the device because the device malfunctioned, and he was unable to review its settings. Fisher testified that the particular device allowed for a recording to have its own track or add to a previously-recorded track by starting it again, and also allowed a user to move files around on the device into folders. He decided to open the device and remove the memory chip as the best way to avoid accidentally damaging any data inside of it. The device did not have a port to connect to a computer; an audio jack would have to be plugged into the earphone jack of the recorder and then that cord plugged into a microphone jack on a computer. Files could also be copied in the same manner and files could be spliced

together on the computer and then uploaded to the device. He further stated that he could not tell time intervals between recordings.

¶ 27    On redirect, Fisher testified that while it was possible to upload files to the recorder from a computer, the user would need a sufficient level of electronic expertise to do so. He again opined that the files from the data chip were not tampered with in any way and that the recorder was functioning properly when it made those recordings. On recross, Fisher stated that the recordings appeared to come from the device; however, if they came from a computer, he would have no way of knowing.

¶ 28    Defense counsel requested a side bar when the State sought admission of its exhibits related to the device and the recordings. Defense counsel argued that there was no foundation laid for admission of those exhibits, while the State argued that the foundation was laid through the silent witness doctrine. The trial court found that the exhibits were admissible under the silent witness doctrine and that defense counsel's objections went to the weight of the evidence, not to its admissibility. The court then admitted them into evidence.

¶ 29    Kenneth Marr testified that he was a forensic audio examiner with the FBI in Quantico and had worked for the FBI for 22 years. He stated that he had previously testified as an expert in the field of audio signal analysis, and the parties stipulated that Marr was an expert in the field. Accordingly, the trial court allowed Marr to testify as an expert witness in audio signal analysis with his notes.

¶ 30    Marr explained that an audio signal analysis examination included four separate types of analysis: (1) critical listening and audio review, where he would listen to the foreground and background sounds in the recording and write down what he heard; (2) narrow band signal analysis, where the recording is put into the computer to generate a display, which he watched

for tones or periodic sounds that were steady in the background and would appear as a spike on the display; (3) high resolution waveform analysis, which generated a computer display as he listened to the audio through headphones, thus looking at the sound while listening to it; and (4) spectrographic analysis, which analyzed the frequency content of the sound, and which was advantageous when listening to voices. Marr identified the FBI cd he received from Fisher and stated that he was asked to examine the recording on the cd for a loud impulse noise and to possibly determine if the impulse sound at a certain time in the recording was a gunshot. He performed the four-part examination on the recording, listing the sounds he heard but he could not find a gunshot impulse that sounded and behaved like a normal gunshot sound that he had analyzed in the past. Marr stated that he could not determine whether the sound was a gunshot because the quality of the sound did not support a definitive finding. He testified that while the Olympus 4100 worked great for recording the frequency band for human voices, it was not the type of recorder that would work well or be able to record very loud impulse sounds. Additionally, the recorder had a voice-activated feature, and he noted several instances where it appeared that a voice-activated event took place during the recording, so he could not say for certain if that was the reason why the recording was of insufficient quality, but it was a possibility.

¶ 31   On cross examination, Marr stated that the recording was of insufficient quality to determine if there was a gunshot present due to the excessive distortion and the lack of resolution. He was also unable to conduct a voice comparison examination because the recording was of insufficient quality and duration. Marr testified that this information came from the report of another examiner in his lab, which was common practice when the recording was analyzed back in 2011. He also familiarized himself with the functionality of the device,

noted that there were no timestamps and that he could not determine the time intervals of recording because when a voice-activated feature was used, it turned on and off and only recorded what was loud enough to activate it. Marr further testified that his notes reflected that authenticity of the recording was not possible due to an unknown original audio format.

¶ 32         On redirect, Marr testified that the microphone on the recorder was not designed to pick up loud impulse sounds and further that the particular recorder used was designed to compress the quality factors in the recording to allow for more recording time.

¶ 33         Officer Amy Lillibridge testified that she was employed with the Cook County Sheriff's Police for 26 years, and on May 23, 2007, she was working as an evidence technician. She attended decedent's autopsy and took photos during the autopsy. Lillibridge identified a medium caliber deformed projectile that she received after decedent's autopsy and delivered it to the Matteson Police Department. She identified various photos of decedent's body as it appeared at the morgue, noting the bullet hole behind her left ear which had been stapled during decedent's medical care.

¶ 34         Viedell Stewart, decedent's son, testified that he was 46 years old and lived in Phoenix, Arizona. He stated that he had another brother and two sisters and identified a photo of decedent in court. According to Stewart, decedent worked for the United States Postal Service (post office) for approximately 28 years. She married defendant in 2003, who Stewart identified in court, and they lived at 717 Oxford for a few years prior to the date of the shooting. He visited decedent at her home about once per year and last saw her on March 7, 2007, when she came to Las Vegas for his wedding. Stewart last spoke to decedent on the Thursday prior to the shooting and explained that decedent called him weekly on Thursdays just to check in.

¶ 35    On May 23, 2007, Stewart was living in St. Paul, Minnesota. Between 4 p.m. and 5 p.m. on that date, Stewart was visited by officers from the St. Paul Police Department, who told him to call an officer at the Matteson Police Department, but they did not tell him why. He called and spoke to a detective, who verified his identity before telling him that decedent had been shot and was in the hospital. Stewart called his siblings, and they began the seven and one-half hour drive to Illinois. They went directly to the hospital, where they saw decedent, who was intubated, and her head was wrapped in a bandage. Other family members and friends who lived in Illinois were already present, but defendant was not there. Stewart testified that defendant did not call or visit the hospital. At approximately 9 p.m. on May 24, 2007, while he and other family members were at the hospital waiting to hear if the doctors would be able to operate on decedent again, an announcement came over the intercom and doctors rushed into decedent's room. Afterwards, a doctor and police officer gathered the family in another room and told them that decedent had passed away. Defendant was not present for the announcement, never called while Stewart was at the hospital, and he never heard from defendant during that time or since. Stewart subsequently identified decedent's body at the morgue. The family held a funeral for decedent and defendant did not assist in making any of the arrangements, nor did he attend the funeral. Stewart testified that he had many occasions to become familiar with decedent's handwriting and identified her handwriting on a page taken from a notebook.

¶ 36    On May 24, 2007, Stewart testified that he and other family members went to decedent's residence before going back to the hospital. Defendant was not there, and neither was a green SUV. After the police released the house to him, Stewart went inside and saw a big pool of blood in the living room, before going upstairs where the bedrooms were located. He testified

that decedent and defendant usually "stayed" in the master bedroom to the left of the stairs, but when he went to that room, decedent's things were not there. He then went to the middle bedroom at the top of the stairs where he saw his mother's things. Stewart stated that only decedent and defendant lived in the house, there was men's clothing in the master bedroom closet, men's toiletries in the bathroom, and items belonging to defendant in the house. While going through his mother's things in the middle bedroom, Stewart found some type of recorder under a pillow and tried to play it, but it did not work. When he changed the batteries, the recorder worked, and Stewart and other family members listened to some of the recordings. Stewart kept the recorder in a safe place before he and his family subsequently listened to more of the recordings after decedent's funeral. He subsequently called the Matteson Police Department and a detective picked up the recorder from him.

¶ 37        After decedent's death, Stewart was the executor of her estate and was in charge of taking care of the house. He never saw defendant at the house; men's clothing and toiletries were still at the house, and two cars were in the garage. Defendant was not part of the process of clearing the house or selling its contents, and the men's belongings were discarded. Stewart identified the cd containing the audio recording that the State had played for him earlier, after which the State sought to publish the recording to the jury.

¶ 38        Defense counsel requested a sidebar, and counsel objected to the cd being published based on improper foundation and relevancy. The State responded that the issue of relevancy had been previously ruled upon in four pretrial motions. The State also made an offer of proof that the portion of recording contained on the cd began with a phone call from Smitty, who had already testified that he called defendant at approximately 7 a.m. on May 23, 2007. The State argued that this set the stage for what it believed was the gunshot and subsequent death of

decedent later in the recording. The State concluded that it was seeking Stewart's identification of the recording as what he listened to in May 2007, which was relevant. It was not seeking the identification of any voices or of a gunshot, which would violate the pretrial order.

¶ 39      Defense counsel stated that Stewart told police that his brother initially recovered the recording device and gave it to him, and that Stewart could not establish the proper foundation for the recorder or its contents. Over defense counsel's objection, the trial court allowed the recording to be published. The State then played the disc in court and Stewart identified it as a recording of what he originally heard on the recorder in May 2007.

¶ 40      On cross examination, Stewart testified that he met defendant before decedent married him, they were not close, and he never spoke with him on the phone. He stated that at the time of her death, decedent was working the morning shift at the post office, and it had been a few months since he visited decedent's home. Stewart acknowledged that the recordings were not timestamped and was unable to say whether the recorder had a date/time capability because it had been 11 years and he could not remember. He stated that he contacted the Matteson Police Department approximately a week after decedent's death on May 31, 2007, and spoke with officers. He stated that he did not tell police that his brother Anthony found the recorder and did not remember calling Anthony before the police arrived. Stewart acknowledged that he had no personal knowledge of the date or time any of the recordings took place as he was not in the residence when they were made.

¶ 41      The parties stipulated to the business records for the finance and purchase of defendant's 2000 Mercury Mountaineer as certified by Nationwide Financial. The vehicle was purchased on April 24, 2007. The State also introduced the parties' marriage certificate dated June 19, 2003.

¶ 42    The parties also stipulated that Walter Daniels would testify that he was the security manager for Jewel-Osco located at 7530 Stony Island Avenue in Chicago. He was alerted by loss prevention agent Willie Ross that a green Mercury Mountaineer had been parked in the store parking lot for over two weeks. Loss prevention contacted a dealership in Kankakee based on information from the vehicle. Subsequently, Daniels contacted the South Suburban Major Crimes Task Force on June 13, 2007, and later than day he met with detectives and reviewed surveillance camera footage showing the SUV entering and parking in the lot on May 24, 2007. After reviewing the surveillance footage in the security office with the detectives, Daniels copied the surveillance footage to a cd that he gave to the detectives and later identified the State's exhibit 28-A as the cd he gave to them.

¶ 43    Detective Shawn White testified that he worked for the Matteson Police Department for just over 17 years and was working on May 23, 2007, as a detective in investigations. He was assigned to investigate decedent's shooting at 717 Oxford, which became a homicide the following day once she died. As part of his investigation, he and Detective Tanya Eskridge went to a hotel in Bourbonnais on May 31, 2007, to speak with decedent's son, Stewart. At that meeting, Stewart gave him a gold Olympus voice recorder which he identified in court. During the conversation with Stewart, he was informed that Stewart's younger brother found the recorder in his mother's residence and that he was present when the recorder was first listened to. Detective White returned to Matteson and inventoried the recorder, before giving it to Sergeant Arvin. Detective White testified that on May 25, 2007, they were still trying to locate defendant, who he identified in court, through phone records and linking addresses to the numbers called from defendant's phone. As part of the investigation, Detective White

interviewed Leon Patterson at his home on May 25, 2007, and after speaking with Patterson, Detective White searched a chair in Patterson's home and found bullets.

¶ 44    At this point, defense counsel made a request for a side bar after objection. Defense counsel considered the line of questioning to be "stealth hearsay" as there was no connection between defendant, Patterson's home, and bullets found there. Defense counsel acknowledged that defendant spent the night there on May 23, 2007, but that alone did not tie him to any bullets found there. The State responded that there was no such legal concept as "stealth hearsay," and that the information was relevant. The trial court sustained the objection regarding any testimony related to the bullets because there was no nexus between the bullets at Patterson's home and defendant. The jury was subsequently instructed to disregard any comments made in connection with finding bullets.

¶ 45    On cross examination, Detective White testified that in May 2007 he worked with a team of detectives. He reasserted that he and Detective Eskridge went to a hotel on May 31, 2007, and spoke with Stewart about a recorder found by his brother Anthony at decedent's home. However, Detective White never talked to Anthony. He also never went into decedent's residence because he was not at work when the case was assigned and later learned that the residence had been "processed" by the Cook County Sheriff's Department, meaning that evidence was collected, and photos were taken. Detective White had no personal knowledge as to where in decedent's house the recorder was recovered from.

¶ 46    Forensic scientist Nicole Fundell testified that she worked for the Illinois State Police Forensic Command at the Joliet Forensic Science Laboratory since April 2001, and that she specialized in firearm and tool mark examination and identification. The parties stipulated that she was an expert in the field of firearms and ballistics identification and the trial court

qualified her as such. Fundell testified how she identified firearms and markings on fired projectiles. She identified a sealed plastic bag containing one silver fired bullet jacket and one large gray fragment of a bullet core which she had previously examined. She looked at the bullet core and found it unsuitable for further comparisons. She also examined the fired bullet jacket and determined it was a .380, 9mm, .38 or .357 class bullet based on its groove impressions. Fundell testified that the list of possible firearms that may have shot that bullet would include a Rossi .38 special based on the lands and grooves inside Rossi firearms and those present on the fired bullet jacket. However, because she did not have the firearm to match it, she could only say generally what may have been able to fire the bullet. Fundell explained the difference between a revolver and a semiautomatic handgun, namely that a revolver's fired cartridge cases stayed in the gun's cylinder until they were manually removed while a semiautomatic ejected the fired cartridge case each time it was fired. She stated that the Rossi .38 special was a revolver.

¶ 47    On cross examination, Fundell confirmed that her examination of the bullet did not conclude a single caliber but a set of similar calibers which all had the same bullet diameter but had different weights and cartridge cases that they were inside of. On redirect, Fundell stated that she could not precisely identify the gun that ejected the bullet because there was no gun to examine, but reconfirmed that a Rossi .38 special revolver could have fired the bullet.

¶ 48    Sergeant Kenneth Arvin testified that he worked for the Matteson Police Department for 28 years, but was retired at the time of trial. On May 23, 2007, he was sent to 717 Oxford because a woman had been shot in the house. When he arrived, he saw a woman lying on the floor in the dining room. Arvin was the supervisor of the investigation division and he spoke to officers on the scene, walked through the residence and around the perimeter of the

residence. Arvin testified to the layout of the inside of the residence, which he described as a trilevel home. He went to the second floor where the bedrooms were located and saw an open spiral notebook on the bed in the middle bedroom, which he identified in court. He identified the caption on the open page of the notebook said "dumb and dumber" with three exclamation points. The page had a series of questions and some statements on it. Arvin testified that he subsequently found a cordless phone on a kitchen counter next to the doorway that led into and from the dining room . He approximated the distance between where the phone was found and where the decedent was lying to be about five or six feet, and recalled that the charging cradle for the phone was in the dining room near decedent. Arvin also indicated that there were two empty beer bottles on the opposite end of the counter. Arvin identified photos showing the master bedroom closet, which was full of men's clothing and a case of beer that matched the bottles in the kitchen, as well as a photo of a garbage can next to the master bedroom closet, with several empty beer bottles inside. Arvin testified that he did not observe any shell casings or bullet holes in the dining room, there were no signs of forced entry on any of the inside entryways to the residence, nor were there any open or broken windows. Arvin also stated that the garage door was closed, the patio doors were locked and, as he walked the outside perimeter of the residence, he saw no damage or signs of forced entry. He also entered the attached two-car garage and saw two vehicles, a Honda, and a Cadillac with an open trunk. Arvin testified that the laundry room door facing the residence's lower level family room was damaged and identified the damage in photos. After leaving the residence, Arvin notified the South Suburban Major Crimes Task Force, which came to Matteson to investigate the case. He also tried to reach defendant to notify him of decedent's shooting by calling the number associated with the residence's alarm billing. A male answered the phone and when he asked for defendant, the

man replied, "wrong number" and hung up. Arvin then attempted to reach defendant at Kingston Tile, but it went to voicemail, and he left a message. Defendant never returned Arvin's call. Arvin also learned what type of vehicle defendant was driving on May 23, 2007, and based on information uncovered by the task force, Arvin had a "wanted" flyer printed for defendant and his vehicle, a 2000 green Mercury Mountaineer. A search warrant was subsequently executed at decedent's residence.

¶ 49     On cross examination, Arvin testified that he arrived at 717 Oxford before 10 a.m. on May 23, 2007. He acknowledged that he did not know whether any clothing had been removed from the master closet or how long the garbage or beer was present in the closet. He also stated that the television was on in the master bedroom when he arrived, and a radio was playing in the kitchen. Arvin went back to the residence with a search warrant around 3:30 p.m. and Cook County evidence technicians and Detective Eskridge conducted the search. A search warrant for defendant's vehicle was also obtained, and it was searched once it was recovered. No prints or gunpowder residue were discovered during the searches. On redirect, Arvin testified that he saw blood on the phone in the kitchen, and that he sent a voice recorder to the FBI in Quantico for analysis.

¶ 50     The parties stipulated that Dr. Arunkumar, the chief medical examiner at the Cook County Medical Examiner's Office, was an expert in the field of forensic medicine. Arunkumar reviewed decedent's autopsy because the doctor that performed the autopsy was no longer with the office. Decedent's body had injuries including a gunshot wound on the left side of her head, just behind the left ear. The wound was stapled because decedent had been treated at the hospital. A medium caliber white metal jacket fragment and a lead bullet fragment were recovered from decedent's brain. There was no evidence of close-range firing and Arunkumar

explained that even though the wound was cleaned, the puncture marks or stippling do not wash away. Decedent also had a purple bruise on her forehead with bleeding underneath, an irregular bruise on her upper left eyelid, two purple bruises on her front left forearm, a bruise on her right knee, and irregular bruises on both legs. No alcohol was found in decedent's system. Decedent's cause of death was homicide from a gunshot wound to the head, which caused brain hemorrhaging and cerebral edema.

¶ 51    Sergeant Jeremy Sims testified that he worked for the Matteson Police Department for 17 years and was the supervisor of the criminal investigations division at the time of trial. On May 23, 2007, he was a detective assigned to investigate the shooting at 717 Oxford. Sims went to the residence and saw the decedent lying on the dining room floor, wearing a post office uniform. Decedent was transported to the hospital, and Sims also went to the hospital to try and speak with her, but decedent was unable to respond to his questions. Sims identified defendant in court as decedent's husband and stated that he unsuccessfully attempted to locate defendant during the investigation. He later learned the type of vehicle defendant drove as well as the temporary plate number, 693H556, and an arrest warrant was issued. Sims confirmed that a flyer was circulated indicating that police were looking for defendant and his vehicle. On June 13, 2007, Sims was notified that defendant's vehicle was parked at a Jewel-Osco at 7530 Stony Island in Chicago. He and Arvin went to that location and spoke with a loss prevention agent and the store supervisor about the vehicle and subsequently viewed surveillance footage of the vehicle being left there on May 24, 2007. Sims was given a copy of the footage, which he inventoried and identified in court. The video footage was published for the jury, and showed a green Mercury Mountaineer pulling into the parking lot and backing into a space in the upper right side of the lot. The driver exited the vehicle and exited the

parking lot. The driver was described as an African-American man with a short or bald hairstyle. Sims observed the vehicle in the lot, with the tags registered to defendant, and had it towed to the Matteson Police Station where a search warrant was executed. There was no damage to the vehicle, and it was never reported stolen. Sims learned through the investigation that defendant's brother-in-law lived near that Jewel-Osco location. On October 13, 2007, he received a tip about defendant's whereabouts and contacted the U.S. Marshal's Office (Marshal's Office). On October 17, 2007, the Marshal's Office indicated that defendant was arrested in Milwaukee, Wisconsin. Sims then went to Milwaukee and took custody of defendant. On cross examination, Sims stated that he was unsure who lived at the residence where defendant was arrested.

¶ 52      Matteson police officer Ray Murray testified that he was a patrol officer for 16 years and was a patrol officer on November 18, 2003, when he responded to a 911 hang-up call at 8:44 a.m. at 717 Oxford. When he arrived, he saw defendant, who he identified in court, and decedent. He saw that decedent had swelling around her right eye, a cut on her lip and scratches on her neck; those injuries were documented in photos. Murray recovered a Rossi .38 special revolver from the master bedroom, which was left with decedent when the officers left with defendant in custody for domestic battery. Defendant was processed at the station. Murray did not see any injuries to defendant that morning. On cross examination, Murray testified that he did not check defendant's entire body for injuries when he was arrested.

¶ 53      The State moved to have all of its exhibits admitted into evidence. Defense counsel continued their objection to the admission of the voice recorder and audio recordings. The trial court admitted all of the State's evidence, including the voice recorder and audio recordings over the previously noted defense objections. The State then rested its case.

¶ 54    Defense counsel moved for a directed finding, which was denied. The trial court then held an instructions conference with the State and the defense, after which defendant was admonished as to his plea of not guilty, his right to jury trial and his right to testify on his own behalf. Defendant chose to remain silent. Both the State and defense rested, and the case then proceeded to closing arguments. The trial court admonished the jury that closing arguments were not evidence, that it would instruct the jury on the law and then they would retire for deliberations.

¶ 55    During the State's closing argument, the defense objected to the following statements, which are relevant to this appeal: (1) on May 23, 2007, decedent was so scared of defendant that she wanted somebody to know what she knew in case she was not around to say it; and (2) defendant changed his life by leaving his family here; the police could not find "them"[2] here.

¶ 56    Defense counsel argued in closing that "what the State just said was not evidence" and that it was the State's burden to prove defendant guilty beyond a reasonable doubt. The State objected to the statement that the "State could not string together what happened on that day for you." Defense counsel's closing focused on the circumstantial nature of the State's case and the lack of direct evidence against defendant.

¶ 57    Defense counsel objected to the State's rebuttal argument regarding defendant's failure to attend decedent's funeral or contact her family members.

¶ 58    After closing arguments, the trial court admonished the jury about its evidentiary rulings during the trial and reiterated that arguments by the attorneys were not evidence. The court

_____

[2] The record is unclear whether the State was referring to defendant not being here or that his family was also not found here.

then gave the jury instructions, including an instruction on circumstantial evidence. During deliberations, the jury requested to view the surveillance footage and listen to the audio recording. Everyone exited the courtroom except the sheriff so that the jury could listen to and view those items.

¶ 59       On August 9, 2018, the jury returned a verdict of guilty for first degree murder and a finding that defendant personally discharged a firearm. The case was continued until September 7, 2018, for posttrial motions.

¶ 60                                    C. Posttrial Proceedings

¶ 61       On August 27, 2018, defendant sent a handwritten letter to Judge Brewer, the presiding judge of the sixth district, in which he alleged that the trial judge (Judge Boyd) erred in admitting the recording at his trial because the State failed to establish a proper chain of custody. He also questioned the trial judge's experience in criminal law and requested a new trial.

¶ 62       On the same date, defendant also sent a *pro se* motion to Judge Boyd's attention, in which he argued that the recording should not have been admitted based on the lack of foundation established by the State and that he received ineffective assistance of counsel because they failed to locate and interview his former neighbor, Mr. Ojelade. Mr. Ojelade reportedly told police that he arrived home 11 minutes prior to the 911 call and did not see defendant or any other vehicle in the driveway or in front of the residence. Further, defendant argued that counsel failed to visit the crime scene to take photos, interview neighbors, and recover relevant evidence of the victim inviting married men to their residence.

¶ 63       At the September 7, 2018, court date, defense counsel acknowledged that defendant sent a handwritten note to the court as well as a *pro se* motion for new trial, but stated that defendant

wished to withdraw the letter and the motion for new trial. The trial court asked defendant about the letter and the motion and defendant responded that he wanted to pursue only his motion for the return of property. Defense counsel indicated that they had no idea what defendant was referring to. The trial court asked defendant if he wanted to withdraw his motion for new trial and defendant responded affirmatively.

¶ 64     On the same date, defense counsel filed a motion for new trial in which it argued that the State made prejudicial, inflammatory, and erroneous statements in closing argument designed to arouse the prejudices and passions of the jury, which prejudiced defendant's right to a fair trial. A supplemental motion for new trial was filed on October 26, 2018, which argued that: (1) the trial court erred in allowing the recordings into evidence because the State failed to lay a proper foundation for the recorder and its contents, and failed to establish a proper chain of custody; (2) the trial court erred in allowing the State to introduce the contents of the recording because there was no witness who testified that the contents fully reflected a conversation and the State failed to provide a foundation for the recording as required by *People v. Smith*, 321 Ill. App. 3d 669 (2001); (3) the trial court erred in admitting the voice recorder and its contents because the chip malfunctioned and defendant had no opportunity to comprehensively examine it; (4) the trial court's ruling did not allow the State to identify the voices on the recording through expert testimony which made the voice recorder and its contents irrelevant and the jury should not have been allowed to make that conclusion; (5) the voice recorder and contents should not have been admitted under the silent witness theory pursuant to *People v. Sangster*, 2014 IL App (1st) 113457; (6) the trial court erred in allowing evidence of the 2003 domestic violence incident because its prejudice outweighed any probative value; (7) the State failed to prove him guilty beyond a reasonable doubt when it failed to present any evidence that

defendant was present when the decedent was shot; (8) the trial court erred in failing to appoint an investigator for defendant when he represented himself *pro se*; and (9) the trial court erred in failing to provide funds to defendant for an expert witness to examine and analyze the capability of the voice recorder when defendant was *pro se* and previously determined to be indigent, thus prejudicing his waiver of counsel contrary to the due process clause of the United States Constitution.

¶ 65     The trial court denied the motion on October 26, 2018, and the case was scheduled for sentencing on December 12, 2018. Defendant was subsequently sentenced to an aggregate 65-year prison term, and his motion to reconsider his sentence was denied. Defendant's timely notice of appeal followed.

¶ 66                                         II. ANALYSIS

¶ 67     On appeal, defendant contends that: (1) he was not proven guilty beyond a reasonable doubt where the State presented no competent evidence showing that he was home when the decedent was shot; (2) the trial court erred when it allowed the introduction of an audio recording obtained from the marital home found by decedent's son after the shooting; (3) he was denied a fair trial where the State argued facts not in evidence during closing arguments and violated the trial court's pretrial evidentiary rulings that barred the State from eliciting prejudicial testimony; (4) the trial court abused its discretion where it allowed evidence of a prior domestic violence incidence under section 115-7.4 (725 ILCS 5/115-7.4 (West 2016)) of the Code of Criminal Procedure (Code) where the incident involved conduct that was factually dissimilar to the charged offense and its prejudicial effect outweighed any probative value; (5) the trial court violated defendant's sixth amendment right to represent himself when it forced him to choose between proceeding *pro se* and engaging an expert witness that was necessary to his

defense; and (6) the trial court erred when it failed to conduct an inquiry into defendant's pro se claim of ineffective assistance of counsel in his posttrial motion for new trial, pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984).

¶ 68                                        A. Forfeiture

¶ 69        At the outset, we note that two of the issues that defendant raises on appeal were not raised in his posttrial motion. Specifically, defendant failed to include his arguments that (1) the audio recording should not have been admitted under the eavesdropping statute, and (2) the State's closing argument argued facts not in evidence. Additionally, defendant failed to object to the complained-of statements by the prosecutor during closing arguments. In general, a defendant preserves an issue for review by timely objecting to it and including it in a written posttrial motion. *People v. Colyar*, 2013 IL 111835, ¶ 27; *People v. Marzonie*, 2018 IL App (4th) 160107, ¶ 51. Because defendant failed to include these matters in his motion for new trial or to even object to the now complained-of statements during trial, they are forfeited. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). We note that waiver is the intentional relinquishment of a known right, whereas forfeiture is the failure to make a timely assertion of a known right. *People v. Dunlap*, 2013 IL App (4th) 110892, ¶ 9; *People v. Hibbler*, 2019 IL App (4th) 160897, ¶ 51.

¶ 70        Defendant acknowledges that he failed to preserve these issues for consideration on appeal; however, he contends that they are reviewable under the plain error doctrine. He argues that the erroneous admission of the audio recording can be reviewed under the first prong of plain error, while errors in the State's closing argument can be reviewed under both prongs of plain error.

¶ 71    The plain error doctrine allows a reviewing court to address defects affecting substantial rights if the evidence is closely balanced or if fundamental fairness so requires it rather than finding the claims forfeited. *People v. Woods*, 214 Ill. 2d 455, 471 (2005). A defendant raising a plain error argument bears the burden of persuasion. *People v. Thompson*, 238 Ill. 2d 598, 613 (2010). The first step in a plain error review generally is to determine whether any error occurred, and the burden is on defendant to establish that such error occurred. *Id.* Accordingly, to establish plain error, a defendant must first show that a clear or obvious error occurred (*id.*), and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error (*People v. Naylor*, 229 Ill. 2d 584, 593 (2008)) or that the error was sufficiently grave that it deprived defendant of a fair trial (*People v. Herron*, 215 Ill. 2d 167, 187 (2005)).

¶ 72    In determining if the evidence was close, a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of the evidence within the context of the case. *Marzonie,* 2018 IL App (4th) 160107, ¶ 53 (citing *People v. Sebby*, 2017 IL 119445, ¶ 53). If the defendant meets his burden, he has demonstrated actual prejudice and his conviction should be reversed. *Id.* (citing *Sebby*, 2017 IL 119445, ¶ 51).

¶ 73    When a defendant claims second-prong error, he must prove that a structural error occurred. *Marzonie*, 2018 IL App (4th) 160107, ¶ 54 (citing *Thompson*, 238 Ill. 2d at 613). A structural error is one that renders a criminal trial fundamentally unfair or unreliable in determining a defendant's guilt or innocence. *People v. Bowens*, 407 Ill. App. 3d 1094, 1101 (2011). Structural errors occur in very limited circumstances, such as the complete denial of counsel, denial of self-representation at trial, trial before a biased judge, denial of a public trial, racial discrimination in the selection of a grand jury, or a defective reasonable doubt

instruction. *Marzonie*, 2018 IL App (4th) 160107, ¶ 54. If the defendant fails to meet his burden of persuasion, the issue is forfeited, and the reviewing court will honor the procedural default. *Id.*

¶ 74                     1. Admission of the Recording Under the Eavesdropping Statute

¶ 75        Defendant asserts that the audio recording was obtained in violation of the eavesdropping statute because he never consented to any recording, which was allegedly made in the privacy of his own home and there was no way for the State to show that decedent consented to it either. At oral argument, defendant's appellate counsel argued that consent was required by all participants to the conversation and further that violation of the statute disallowed such recording to be used in any civil or criminal trial. Additionally, appellate counsel conceded that the statute in existence at the time the recording was first discovered was subsequently declared unconstitutional and void *ab initio*. However, appellate counsel argued that the prior version of the statute would apply and that the recording was inadmissible under that version. He argues that this forfeited claim of error is reviewable under the first prong of plain error.

¶ 76        We must first determine if any error occurred. The eavesdropping statute in effect from the time the audio recording was recovered until defendant filed his *pro se* motions to suppress based on violations of the eavesdropping statute in 2014 was 720 ILCS 5/14-2(a), 14-5 (West 2006). As noted at oral argument, this statute was declared facially unconstitutional by our supreme court in *People v. Clark*, 2014 IL 115776, for being overbroad. When a statute is held facially unconstitutional, it is void *ab initio*, meaning that it is as if the law never existed. *People v. Dunmore*, 2013 IL App (1st) 121170, ¶ 9.

¶ 77        The parties did not agree as to the implication of a declaration that a statute is unconstitutional and considered void *ab initio*. Defendant argued that the proper consideration

is to consider the version of the statute in effect prior to the one that was found unconstitutional, citing *People v. Rodriquez*, 313 Ill. App. 3d 877 (2000). In contrast, the State distinguished *Rodriquez* and argued that there was no violation of the eavesdropping statute because it did not exist at the time the recording was recovered because it was declared void *ab initio*. Additionally, the State argued that the eavesdropping statute was subsequently amended, and the recording would have been admissible under the amended version.

¶ 78    Our supreme court has held that when a statute is held facially unconstitutional, it is unconstitutional in all its applications and is void *ab initio*. *People v. Blair*, 2013 IL 114122, ¶ 28. The court further clarified that while such a finding does not render a statute nonexistent, it does mean that the statute was constitutionally infirm from the moment of its enactment and is, therefore, unenforceable. *Id.*

¶ 79    Turning to the case at bar, we find that there was no error in the trial court's admission of the audio recording as the version of the eavesdropping statute in effect from 2007 until 2014 was declared unconstitutional on its face and was unenforceable. It follows then that if the statute was unenforceable, there could be no violation. We find *Rodriquez* distinguishable because there was no constitutional argument made in that case nor was there a void *ab initio* finding for the version of the statute in effect during the course of the case. Our finding that there was no error by the trial court ends our inquiry for purposes of plain error, and the procedural forfeiture will stand.

¶ 80                    2. The State's Closing Argument

¶ 81    Defendant also contends that the State committed reversible error when it argued facts not in evidence during its closing argument. Specifically, defendant argues that the prosecutor

argued facts not in evidence when he speculated as to who the speakers were in the audio recording and that the decedent used the device to record defendant's abuse.

¶ 82    In our review of the State's closing argument, there were a total of three complained-of comments that defendant objected to: (1) on May 23, 2007, decedent was so scared of defendant that she wanted somebody to know what she knew in case she was not around to say it; (2) defendant changed his life by leaving his family here; the police could not find them here; and (3) statements regarding defendant's failure to attend decedent's funeral or contact her family members. None of the comments that defendant asserts as erroneously arguing facts not in evidence were objected to during the State's closing argument or included in his posttrial motion. Thus, this issue is forfeited.

¶ 83    Defendant concedes that none of the complained-of errors in the State's closing argument were preserved for review because they were not included in defendant's posttrial motion. However, he asserts that we can review them under both prongs of the plain error doctrine because the evidence was closely balanced, and the error was serious.

¶ 84    We must first determine if any error occurred during the State's closing argument. The State has wide latitude in both its opening statements and closing arguments and may comment on the evidence and any fair, reasonable inferences it yields. *People v. Glasper*, 234 Ill. 2d 173, 204 (2009). Prosecutors may not argue assumptions or facts not contained in the record. *Id*. However, the State is entitled to comment on the evidence and any reasonable inferences drawn therefrom (*People v. Cruz*, 2019 IL App (1st) 170886, ¶ 41), and it may assume the truth of the State's evidence (*People v. Green*, 2017 IL App (1st) 152513, ¶ 77). A closing argument must be viewed in its entirety, and the challenged remarks must be viewed in their context. *Glasper*, 234 Ill. 2d at 204. Statements will not be held improper if they were

provoked or invited by the defense counsel's argument. *Id*. It is also improper for the State to make comments that have no other purpose but to arouse the prejudices and passions of the jury. *People v. Guerrero*, 2020 IL App (1st) 172156, ¶ 10. A prosecutor may not misstate the law or attempt to shift the burden of proof to defendant. *People v. Carbajal*, 2013 IL App (2d) 111018, ¶ 31. Even if remarks were inappropriate, reversal is only required if they engendered substantial prejudice against the defendant such that it is impossible to tell whether the verdict of guilt resulted from them. *Guerrero*, 2020 IL App (1st) 172156, ¶ 10.

¶ 85 Having examined the State's closing argument in detail, we cannot say that the State committed a clear or obvious error in its remarks. The complained-of remarks, namely that the prosecutor speculated as to who the speakers were in the audio recording and that the decedent used the device to record defendant's abuse, were proper inferences from the State's evidence. In the audio recording, the male speaker stated "Brenda" several times throughout the clip and woman responded, so it was a reasonable comment on the evidence for the prosecutor to speculate that the speakers were defendant and decedent. Additionally, based on the evidence presented of at least one prior domestic-violence related incident between defendant and decedent, it was not unreasonable for the prosecutor to state that decedent bought the recorder to record defendant's abuse. Those comments were proper based on the State's assumption of the truth of its evidence. We conclude that defendant cannot obtain relief under the plain error doctrine because he fails to demonstrate that any error occurred. Accordingly, the procedural default will stand.

¶ 86 3. Ineffective Assistance of Counsel

¶ 87 In the alternative, defendant argues that trial counsel's failure to include these issues in the posttrial motion was ineffective assistance of counsel. We disagree.

¶ 88    The standard for reviewing an ineffective assistance of counsel claim is whether the attorney's conduct fell below an objective standard of reasonableness and that defendant was prejudiced by counsel's errors. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). To demonstrate prejudice, defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different, and a reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* at 694. If either prong of the *Strickland* test cannot be shown, then the defendant has not established ineffective assistance of counsel. *Id.* at 697.

¶ 89    We find that defendant's claim of ineffective assistance of counsel fails because counsel was not deficient where any objection to the challenged remarks would have bene unsuccessful because, as discussed above, those remarks were based on the prosecutor's reasonable inferences and assumptions from the State's evidence. Accordingly, defendant cannot meet his burden of establishing prejudice as there is no reasonable probability that the outcome of the trial would have been different if counsel had made futile objections to the prosecutor's challenged closing argument remarks.

¶ 90    We now turn our attention to the remainder of defendant's arguments on appeal.

¶ 91                               B. Sufficiency of the Evidence

¶ 92    Defendant  contends that the State failed to prove beyond a reasonable doubt that he killed decedent where there was no competent evidence showing that he was present in the home when she was shot. He argues that the State's case was entirely based on circumstantial evidence that was insufficient to prove that he was guilty beyond a reasonable doubt.

¶ 93    When reviewing the sufficiency of the evidence, it is not the function of the reviewing court to retry the defendant. *People v. Hall*, 194 Ill. 2d 305, 329-30 (2000). Rather, the relevant

inquiry is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979). This standard of review applies in cases whether the evidence is direct or circumstantial. *People v. Saxon*, 374 Ill. App. 3d 409, 416 (2007). The credibility of the witnesses, the weight to be given their testimony, and the resolution of any conflicts in the evidence are within the province of the trier of fact, and a reviewing court will not substitute its judgment for that of the trier of fact on these matters. *People v. Brooks*, 187 Ill. 2d 91, 131 (1999). The testimony of a single witness, if positive and credible, is sufficient to convict. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009). Reversal is justified only where the evidence is so unsatisfactory, improbable, or implausible that it raises a reasonable doubt of defendant's guilt. *People v. Slim*, 127 Ill. 2d 302, 307 (1989).

¶ 94        Circumstantial evidence is sufficient to sustain a criminal conviction, provided that such evidence satisfies proof beyond a reasonable doubt of the elements of the crime charged. *Hall*, 194 Ill. 2d at 330. The trier of fact need not be satisfied beyond a reasonable doubt as to each link in the chain of circumstances; it is sufficient if all of the evidence taken together satisfies the trier of fact beyond a reasonable doubt of the defendant's guilt. *Id.* To prove guilt beyond a reasonable doubt does not mean that a jury must disregard the inferences that flow normally from the evidence before it. *Saxon*, 374 Ill. App. 3d at 417.

¶ 95        Here, defendant was tried for first degree murder under section 9-1(a)(2), known as "knowing murder"- when, in performing the acts that cause the death of an individual, he knows that such acts create a strong probability of death or great bodily harm. (725 ILCS 5/9-1(a)(2) (West 2006).

¶ 96     Viewing the evidence presented at defendant's trial in the light most favorable to the State, as we must, we find that a jury could reasonably conclude that defendant committed the knowing murder of decedent. There was evidence presented at defendant's trial that his coworker Smitty called defendant on the morning of the shooting just after 7 a.m. because defendant was late for work and had picked up Smitty's paycheck the day prior. The audio recording appeared to corroborate this phone call as the male speaker on the recording, which the jury apparently inferred was defendant, greeted Smitty when he received a call. The male speaker said that he would be at work in an hour, but ultimately did not.

¶ 97     There was also evidence presented that a call to 911 was made from a landline at the parties' residence, apparently after the shooting. The police department dispatched officers to the residence after receiving the 911 hang-up call based on a prior dispatch to the residence during a domestic incident where a firearm was found on the premises. Smitty's testimony also confirmed that defendant and his wife were having marital issues.

¶ 98     When police arrived, decedent was lying face down in a pool of blood in the dining room, and the firearm previously found there was not in the residence. Police did not find any shell casings near decedent or elsewhere in the residence. The ballistics expert testified that the firearm, a Ross .38 special revolver, retained its cartridge cases when fired, which corroborated why no shell casings were found. A cordless phone was found lying on the kitchen counter with blood on it, while the phone cradle was found near decedent on the floor. Decedent was unresponsive and was subsequently transported by ambulance to the hospital where she died the following day. Police unsuccessfully attempted to reach defendant several times to notify him that decedent had been shot. The medical examiner testified that decedent had been shot in the back of her head, near her left ear, and that the cause of her death was homicide.

¶ 99    Evidence was also presented that defendant never returned to the residence, never returned to work, did not go to the hospital, and did not attend decedent's funeral. There was evidence presented that defendant had recently purchased a green Mercury Mountaineer, through the financing agreement and Smitty's testimony. That vehicle was not present at the residence on the day of the shooting, but was shown on a surveillance video being parked at a Jewel-Osco located at 7530 S. Stony Island in Chicago and a bald, African-American man exiting the vehicle, on May 24, 2007, the day after the shooting. The driver exited the vehicle and the parking lot, leaving the vehicle unattended in the parking lot for two weeks. The vehicle was identified as belonging to defendant based on the license plates, showed no signs of tampering, and had not been reported stolen. There was also evidence presented that one of defendant's relatives lived near the location where the vehicle was found. Defense counsel corroborated that defendant stayed with Patterson on the night of the shooting during a sidebar, and the evidence established that defendant was eventually located, five months later, in Milwaukee. All of this evidence supports the reasonable inference that defendant fled the area after the shooting.

¶ 100    With respect to the gunshot wound, there was testimony that the bullet removed from the decedent's head could have been fired from a Rossi .38 special revolver which was the type of firearm police had previously found at the marital residence. Moreover, in addition to the gunshot wound, the decedent had bruising to her face and neck; similarly, in the prior domestic violence incident, decedent had head injuries.

¶ 101    Finally, the State presented the audio recording, which the trial court found relevant and allowed the jury to make its own determination about. While the voices on the audio recording were never confirmed by any witness to be those of defendant and decedent, the male voice

addressed "Brenda" throughout the recording, so the jury could have reasonably inferred that the voices belonged to defendant and decedent. The female voice stated that she was going to work, decedent's son testified that she worked for the post office, and decedent was wearing a postal uniform when her body was found by police. Additionally, although the expert witnesses were unable to conclusively state that the loud impulse noise on the recording was a gunshot, the jury could have reasonably determined that it was a gunshot when they listened to the recording. It was also a reasonable inference for the jury to conclude that the recording took place on the morning of the shooting based on the Smitty's phone call, decedent being dressed in her work uniform and the time of the 911 call.

¶ 102     The reviewing court must allow all reasonable inferences from the record in favor of the State. *People v. Beauchamp*, 241 Ill. 2d 1, 8 (2011). It is the trier of fact who bears the responsibility to assess the credibility of the witnesses, weigh the evidence presented, resolve conflicts in the evidence, and draw reasonable inferences from the evidence. *People v. Williams*, 193 Ill. 2d 306, 338 (2000). We afford the trier of fact great deference (*People v. DePaolo*, 317 Ill. App. 3d 301, 306 (2000)) and will not set aside a conviction unless the evidence is so improbable or insufficient that there remains a reasonable doubt as to defendant's guilt (*People v. Campbell*, 146 Ill. 2d 363, 374 (1992)).

¶ 103     During closing argument, defense counsel argued to the jury that the State failed to establish that defendant was at the marital residence on the morning of the shooting. Based on defense counsel's argument and the State's evidence presented at trial, the jury was well aware of the lack of direct evidence of defendant's guilt, but apparently resolved the lack of direct evidence in favor of the State and concluded that the circumstantial evidence showed that defendant was present at the residence that morning, as was its prerogative as the trier of fact.

See *People v. Williams*, 2015 IL App (1st) 1300097, ¶ 29. Taken together, the circumstantial evidence presented by the State as well as defendant's conduct after decedent's shooting, we find that this evidence, when viewed in the light most favorable to the State, allowed a rational trier of fact to find defendant guilty beyond a reasonable doubt of first degree murder. *Slim*, 127 Ill. 2d at 307.

¶ 104    C. Violation of the Trial Court's Preliminary Evidentiary Rulings

¶ 105    Defendant next contends that two of the trial court's pretrial evidentiary rulings were in error. First, he argues that the trial court erred when it allowed the introduction of an audio recording obtained from a device found by the decedent's son because: 1) the State failed to lay a proper foundation for its admissibility; 2) the recording had no probative value; and 3) the malfunctioning of the device after testing was done at the State's behest warranted sanctions pursuant to the discovery rules. Additionally, defendant contends that the trial court abused its discretion when it granted the State's motion *in limine* and published evidence of a prior domestic violence incident to the jury under 725 ILCS 5/115-7.4 (West 2018) where the incident involved conduct that was factually dissimilar to the offense charged and its prejudicial value outweighed any probative value.

¶ 106    1. General Principles Regarding Review of Evidentiary Issues

¶ 107    Typically, evidentiary rulings are within the trial court's sound discretion and will not be disturbed on review unless the court has abused that discretion. *People v. Risper*, 2015 IL App (1st) 130993, ¶ 32 (citing *People v. Caffey*, 205 Ill. 2d 52, 89 (2001)). This is a highly deferential standard, where error is only found if the trial court's ruling is so arbitrary or fanciful that no reasonable person would agree with the view adopted by the court. *Id.* The reason for this deferential standard is that the trial court's decision to admit evidence is often

not made in isolation, but rather after consideration of many circumstances, including questions of prejudice and reliability, which the trial court is in a more suitable position to analyze than a reviewing court. *Id.*

¶ 108     Relevance is a threshold requirement that must be met by every item of evidence. *People v. Dabbs*, 239 Ill. 2d 277, 289 (2010). All relevant evidence is admissible, except as otherwise provided by law. *Id.* Evidence which is not relevant is not admissible. *Id.*; Ill. R. Evid. 402 (eff. Jan. 1, 2011). Further, although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. Ill. R. Evid. 403 (eff. Jan. 1, 2011).

¶ 109     With those general principles concerning the admissibility of evidence in mind, we turn our attention to consideration of defendant's specific arguments on appeal. As previously noted, defendant filed several motions to suppress in an effort to keep the audio recording from being admitted into evidence.

¶ 110                         2. Foundation and Probative Value

¶ 111     Defendant first contends that the State failed to adequately lay the proper foundation for the admissibility of the audio recording under the silent witness theory and further that the recording had no probative value where the speakers in the recording could not be identified, the time between the recordings could not be determined, the date of the recording was unknown, and the sound was never  determined to be a gunshot.

¶ 112     As previously stated, the admissibility of trial evidence rests in the trial court's sound discretion, and we will not reverse its ruling absent an abuse of that discretion. *People v. Montes*, 2013 IL App (2d) 111132, ¶ 61. There is no doubt that sound recordings are admissible

if they are otherwise competent, material, and relevant and where a proper foundation is laid. *Id.* Under the silent witness theory, a recording may be admitted without the testimony of a witness with personal knowledge of what the recording portrays as long as there is sufficient proof of the reliability of the process that produced the recording. *People v. Sangster*, 2014 IL App (1st) 113457, ¶ 48. The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims. *People v. Reynolds*, 2021 IL App (1st) 181227, ¶ 48; Ill. R. Evid. 901(a) (eff. Jan. 1, 2011). Generally, an audio recording is authenticated when a participant to the conversation or a person who heard the conversation while it was taking place identifies the voices of the people in the conversation and testifies that the recording accurately portrays the conversation. *Reynolds*, 2021 IL App (1st) 181227, ¶ 49. However, when there is no witness with personal knowledge of what the recording portrays, a sufficient foundation to admit the recording may be laid under the silent witness theory. *Id.* Under that method of authentication, a recording may be admitted without the testimony of a witness with personal knowledge of what the recording portrays as long as there is sufficient proof of the reliability of the process that produced the recording. *Id.*

¶ 113     This court has previously held that a sufficient foundation may be laid for the admission of an audio recording by evidence regarding: 1) the capability of the device for recording; 2) the competency of the operator; 3) the proper operation of the device; 4) the preservation of the recording with no changes, additions, or deletions; and 5) the identification of the speakers. *People v. Smith*, 321 Ill. App. 3d 669, 675 (2001). Our supreme court has stressed that "this list of factors is nonexclusive" and each case must be evaluated on its own and depending on the facts of the case, some of the factors may not be relevant or additional factors may be

considered. *People v. Taylor*, 2011 IL 110067, ¶ 35. Regardless of the factors used, the dispositive issue in each case is the accuracy and reliability of the process that produced the recording. *Id.*

¶ 114    In the case at bar, we find that the State laid the proper foundation for the audio recording under the silent witness theory where the recording device was examined by the FBI and there was expert testimony presented through Fisher as to its capabilities, that the device was operating properly at the time the recordings were made, and that the recorder or its memory chip were not tampered with or altered in any way before they were examined. Both items were inventoried by the FBI and kept in those inventory bags until they were opened for examination during the pretrial proceedings. Additionally, there is no dispute that the recording device was recovered from the parties' residence in the room where decedent was sleeping, regardless of who initially found it. We conclude that with such testimony, the State presented sufficient proof of the reliability of the process that produced the audio recording. Unless the defendant produces actual evidence of tampering, substitution, or contamination, the State need only establish a probability that tampering, substitution, or contamination did not occur. *People v. Dennis*, 2011 IL App (5th) 090346, ¶ 28. Any deficiencies go to the weight rather than the admissibility of the evidence. *Id.,* (citing *People v. Payne*, 239 Ill. App. 3d 598, 706 (1993)). No such evidence of tampering, substitution or contamination was presented by defendant. We therefore conclude that the audio recording was properly authenticated under the silent witness theory.

¶ 115    Defendant further contends that the audio recording had no probative value but was unduly prejudicial. We disagree.

¶ 116    The determination of whether the prejudicial effect of evidence substantially outweighs its probative value rests within the sound discretion of the trial court. *People v. Sims*, 2019 IL App (3d) 170417, ¶ 29. As our supreme court has explained, relevant evidence will not be excluded merely because it may prejudice the accused. *People v. Williams*, 181 Ill. 2d 297, 314 (1998). Rather, a trial judge must weigh the prejudicial effect and probative value of a piece of evidence. *Id*. Probative value refers to the relevance of a particular piece of evidence.

¶ 117    Here, we find that the probative value of the recording was not outweighed by its prejudicial effect. It is clear that the audio recording was relevant to decedent's murder as it could have been useful to the jury. The jury could have concluded that the voices on the recording belonged to defendant and decedent and that Smitty's call to defendant was captured on the audio recording, thus establishing that defendant was in the residence the morning of the shooting. The recording also appeared to corroborate the marital issues between defendant and decedent as Smitty testified. Additionally, the female voice on the recording stated that she was going to work, and decedent was wearing her work uniform when she was found lying on the floor after the shooting. The recording also appeared to reflect police activity at the residence after the 911 call. We find that the audio recording was clearly relevant. While no witness identified defendant or decedent as the speakers on the recording, and the recording posed some prejudice to defendant, the prejudice did not outweigh the probative value, we find that the prejudice did not amount to reversible error for reasons further discussed below. We conclude that the trial court did not abuse its discretion in admitting the audio recording.

¶ 118            3. Denial of Sanctions for the Preservation of the Memory Chip

¶ 119    In a related issue, defendant contends that the trial court erred in denying his motion for sanctions against the State for its failure to preserve the recorder's memory chip to allow for

independent testing by the defense, which was a discovery violation. The trial court declined to issue sanctions, finding that there was no bad faith by the State, the recording itself was not the essence of the charges against defendant, and there was no order issued for preservation. Defendant contends that he did not need to show bad faith by the State or have a preservation order for the trial court to impose sanctions.

¶ 120    We note that a discovery violation can be analyzed under the due process clauses of the United States (U.S. Const., amends. V, XIV) and State Constitutions (Ill. Const.1970, art. 1, § 2) or under Illinois Supreme Court Rule 415(g)(i) (eff. Oct. 1, 1971). *People v. Moore*, 2016 IL App (1st) 133814, ¶ 23. In this case, it appears that defendant is only arguing that the trial court's failure to exclude the audio recording was an appropriate sanction under the discovery rules.

¶ 121    Rule 415(g)(i) authorizes a trial court to impose sanctions for a party's inadvertent failure to follow discovery orders, including the exclusion of evidence. Ill. S. Ct. R. 415(g)(i) (eff. Oct. 1, 1971). The trial court is allowed to exercise its discretion when selecting a Rule 415(g)(i) sanction. *People v. Guja*, 2016 IL App (1st) 140046, ¶ 60.

¶ 122    In this case, defendant contends that the requested discovery sanction to exclude the recording was proper because the State violated the defense's discovery of tangible items that would be used in defendant's trial. Defendant was unable to independently examine the chip and the attempt to obtain other information from the data within the chip. We disagree with defendant's theory that exclusion of the audio recording was the only available sanction for the inadvertent damaging of the memory chip as the proper sanction for a discovery violation is left to the trial court's discretion.

¶ 123    Our supreme court held, in *People v. Newberry*, 166 Ill. 2d 310, 315 (1995), that even absent bad faith, there are circumstances where trying the defendant would deny him due process when the destroyed evidence was essential to and determinative of the outcome of the case. In that case, defendant was charged with possession of drugs, which the police mistakenly destroyed after the substance tested negative for drugs, but later tested positive, and the trial court dismissed the indictment. *Newberry*, 166 Ill. 2d at 312-13. In affirming the trial court, the supreme court found that the defendant could not be convicted of the possession charges without proof of the content of the substance, and conversely, could not hope to exonerate himself without a chance to have his own experts examine the substance. *Id.* at 315.

¶ 124    Additionally, this court addressed the issue of a lost videotape in *People v. Camp*, 352 Ill. App. 3d 257 (2004), which is factually similar to the case before us. In that case, the defendant was charged with driving under the influence and subsequently moved to dismiss the charge during discovery because the State had lost a videotape of his field sobriety tests. *Id*. at 258. We concluded that the circumstances were distinguishable from cases where the physical evidence was essential or outcome determinative, noting that "[a]lthough the videotape may be important to defendant, and its loss may prejudice him, the tape itself did not give rise to the charge against [him]." *Id*. at 261.

¶ 125    Defendant cites to *People v. Koutsakis*, 255 Ill. App. 3d 306 (1993) to support his argument that the recording should have been suppressed as a sanction to the State. However, we find that case actually supports the sanction imposed by the trial court in the instant case. In *Koutsakis*, the testimony of police officers involved in the stop and search of defendant's vehicle from which cannabis was recovered was limited as a sanction for the State's failure to preserve the tape recording of radio transmissions made by the officers during the stop. *Id*. at

310. We held that the tape recording was discoverable, sanctions could be imposed in the absence of bad faith, and the excluding the testimony of the police officers on matters which may have been contained on the tape as a sanction was not an abuse of discretion. *Id*. at 312. We concluded that the trial court could properly fashion a sanction for a discovery violation when it was proportionate to the magnitude of the violation. *Id*. at 314.

¶ 126    That is precisely what happened here. Defendant was charged with murder and such charge was not premised on the existence of the memory chip, recording device, or audio recording but rather on certain events, about which the recording was simply one source of evidence, albeit a potentially important one. The recording device and memory chip were examined by a neutral, third party expert, namely the FBI, and testimony was presented about the tests used to determine the capabilities of the device and the audio recording was preserved and downloaded to a cd that was available to the defense. The court does not favor the exclusion of evidence as a Rule 415(g)(i) sanction because exclusion does not further the goal of truth seeking. See *People v. Rubino*, 305 Ill. App. 3d 85, 88 (1999). In allowing the audio recording into evidence, the trial court limited its prejudicial effect by not allowing identification testimony of the voices on the recording, which was, in essence, a sanction. Further, as the experts were unable to conclusively establish that the loud impulse sound in the recording was a gunshot, the prejudicial effect of the audio recording was further limited. We find that the limitations imposed by the trial court on the admission of the audio recording were sufficient sanctions for the State's failure to preserve the memory chip for analysis and was not an abuse of discretion.

¶ 127    D. Admission of Prior Domestic Violence Evidence

¶ 128    Defendant also contends that the trial court erred in admitting evidence of a prior domestic violence incident between him and decedent under section 115-7.4 of the Code (725 ILCS 5/115-7.4 (West 2016)) where the incident involved conduct that was factually dissimilar to the offense charged, and its prejudicial effect outweighed any probative value.

¶ 129    As a common law rule of evidence in Illinois, it is well settled that evidence of other crimes is admissible if relevant for any purpose other than to show a defendant's propensity to commit crimes. *Dabbs*, 239 Ill. 2d at 283. Such purposes include but are not limited to motive, intent, identity, and accident or absence of mistake. *Id*. The admissibility of other-crimes evidence is within the sound discretion of the trial court, and its decision on the matter will not be disturbed absent a clear abuse of that discretion. *Id.*

¶ 130    The common law rule has been abrogated in part by section 115-7.4 of the Code, titled "Evidence in domestic violence cases," which provides:

"(a) In a criminal prosecution in which the defendant is accused of an offense of domestic violence as defined in paragraphs (1) and (3) of Section 103 of the Illinois Domestic Violence Act of 1986, evidence of the defendant's commission of another offense or offenses of domestic abuse is admissible, and may be considered for its bearing on any matter to which it is relevant.

(b) In weighing the probative value of the evidence against undue prejudice to the defendant, the court may consider:

(1) the proximity in time to the charged or predicate offense;

(2) the degree of factual similarity to the charged or predicate offense; or

(3) other relevant facts and circumstances.

(c) In a criminal case in which the prosecution intends to offer evidence under this

- 49 -

Section, it must disclose the evidence, including statements of witnesses or a summary of the substance of any testimony, at a reasonable time in advance of trial, or during trial if the court excuses pretrial notice on good cause shown.

(d) In a criminal case in which evidence is offered under this Section, proof may be made by specific instances of conduct, testimony as to reputation, or testimony in the form of an expert opinion, except that the prosecution may offer reputation testimony only after the opposing party has offered that testimony." 725 ILCS 5/115-7.4 (West 2016).

¶ 131    Thus, other crimes evidence is admissible to prove propensity as provided under section 115-7.4 of the Code. *People v. Nixon*, 2016 IL App (2d) 130514, ¶ 36. This enactment followed the legislature's enactment of section 115-7.3 of the Code, titled "Evidence in certain cases," which created a similar exception to the common law propensity rule. *Dabbs*, 239 Ill. 2d at 285. When a defendant is charged with certain crimes involving sexual assault or abuse, this statute allows the admission of evidence of previous offenses of the same types. 725 ILCS 5/115-7.3 (West 2016). However even if other-crimes evidence is otherwise admissible, it may be excluded if it is irrelevant or if the risk of undue prejudice substantially outweighs its probative value. *Nixon*, 2016 IL App (2d) 130514, ¶ 36.

¶ 132    Here, we find that evidence of defendant's prior arrest for a domestic violence incident toward decedent was relevant and admissible in defendant's subsequent murder trial. It was relevant to show defendant's intent and inclination to harm decedent and that he did not commit the murder as a result of self-defense or due to a fit of passion. It was also relevant and admissible to show the absence of mistake in any harm caused to decedent. We conclude that the trial court did not abuse its discretion in determining that defendant's prior domestic

violence arrest was more probative than unduly prejudicial, and the trial court did not err in admitting the evidence.

¶ 133                                    E. Prosecutorial Error

¶ 134          Defendant next contends that he was denied a fair trial where the State violated the trial court's pretrial orders barring it from eliciting certain prejudicial testimony. Specifically, defendant argues that the State repeatedly violated the trial court's pretrial rulings by eliciting inadmissible evidence and  the State's misconduct constitutes plain error and requires reversal.

¶ 135          Defendant contends that the State repeatedly violated the trial court's pretrial evidentiary rulings by eliciting inadmissible prejudicial evidence through the testimony of certain witnesses.  Prior to trial, defendant filed a motion *in limine* to bar the State from eliciting certain testimony. After a hearing, the State was precluded from eliciting testimony that: (1) decedent intended to divorce defendant and that there was a prior domestic violence call involving a gun by the 911 operator. Our review of the record reveals that during trial, there were three instances where a witness responded to the prosecutor's question with barred information: twice during Gryczewski's testimony where she first stated that there were prior 911 calls to 717 Oxford for domestic and second that there was a previous call for a domestic with a gun; and during Smith's testimony when he stated that defendant told him that his wife was talking about getting a divorce. In each of those instances, when the barred testimony was elicited, defense counsel promptly objected and the State responded, both of which were on the record. In each instance, a sidebar was held in the judge's chambers, and the trial court ultimately sustained the objection and admonished the jury to disregard the improper statement.

¶ 136          A violation of a motion *in limine* will constitute a ground for mistrial only where the violation deprived defendant of a fair trial. *People v. Hall*, 194 Ill. 2d 305, 341- 42 (2000).

Contrary to defendant's assertion, we find that the barred information came from improper testimony, not improper questioning by the State. While we do agree with defendant that such testimony was improper in light of the pretrial ruling, we do not find that it deprived him of a fair trial. The trial court's prompt action in sustaining the objection and instructing the jury to disregard the comments cured any error from the improper testimony. *People v. Jones*, 155 Ill. App. 3d 641, 646 (1987). Although there are situations where the improper testimony is so damaging that a trial court cannot cure the prejudicial effect (see *People v. Carlson*, 79 Ill. 2d 565, 577 (1980)), this is not such a situation. Here the State asked a single question of Smith, who responded with a narrative that included the barred statement. Similarly, the State asked Gryczewski about how she handled the 911 hang-up, to which she twice stated that it was for a previous domestic and then that it was a prior domestic with a gun. From our examination of the question and response, the State's questions were nonleading and not designed to elicit the barred testimony. We disagree with defendant's characterization that the State purposely elicited the testimony. Rather, it was Gryczewski's answer that was improper, and the trial court allowed defendant to cure the error by asking a leading question. We conclude that the trial court's act of sustaining defendant's objections and subsequently admonishing the jury cured any prejudice to defendant.

¶ 137                    F. Sixth Amendment Right to Self-Representation

¶ 138        Defendant further contends that the trial court violated his sixth amendment right to represent himself when it forced him to choose between proceeding *pro se* or engaging an expert witness that was necessary to his defense.

¶ 139        It is well established that the sixth amendment to the United States Constitution provides for the right of self-representation in criminal proceedings. *People v. Foster*, 391 Ill. App. 3d

487, 491 (2009). A criminal defendant has a constitutional right to represent himself if he makes an unequivocal request to do so. *People v. Shelton*, 401 Ill. App. 3d 564, 574 (2010). In the case at bar, defendant concedes that his request to represent himself was unequivocal and properly accepted by the trial court. However, defendant asserts that as a *pro se* litigant he was also entitled to transcripts and a publicly-funded expert witness.

¶ 140    Under both the Illinois Constitution (Ill. Const. 1970, art. II, § 8) and the United States Constitution (U.S. Const., amend. XIV), a criminally accused has the fundamental right to summon witnesses in his behalf. Such right is not dependent on the financial circumstances of the defendant. *People v. Watson*, 36 Ill. 2d 228, 234 (1966); *People v. Lawson*, 163 Ill. 2d 187, 220 (1994). A denial of funds to an indigent for the securing of expert witnesses in defense of criminal charges may violate constitutional protections in certain circumstances. *Id*. at 574-75. Whether it is necessary to subpoena expert witnesses in order to assure a fair trial will depend upon the factors in each case. *Watson*, 36 Ill. 2d at 234. Our supreme court has held that the touchstone in determining whether an indigent defendant is entitled to funds to secure an expert is not what is useful, helpful, valuable, or even important to his defense but rather what is crucial to it. *Id.* at 75; *People v. Keene*, 169 Ill. 2d 1, 7 (1995). The protections are triggered when the expertise sought goes to the heart of the defense. *Id.* Further, there must be some showing that the lack of funds for the expert will therefore prejudice the defendant. *Lawson*, 163 Ill. 2d at 222.  We review a trial court's decision not to provide funds for an expert witness for an abuse of discretion. *People v. Wilson*, 117 Ill. App. 3d 744, 749 (1983).

¶ 141    In this case, while representing himself *pro se*, defendant sought an expert to analyze the capability of the recording device and for an investigator. In his brief, defendant contends that he needed his own expert, "at the very least, to educate himself about the device's

specifications and prepare himself for an effective cross examination of the FBI experts. Thus, the services sought were 'necessary to prove a crucial issue in the case.'" We disagree.

¶ 142    Here, the record indicates that defendant did not establish the necessity of the expert. While it may have been helpful to defendant's understanding of how the device worked, defendant has made no substantive argument in support of his claim that an expert to analyze the capabilities of the device was crucial to his defense. The audio recording was allowed into evidence for the jury as relevant evidence based on pretrial rulings; however, no witness identified the voices on the recording. There were no dates for the recordings submitted into evidence. Nor was the sound on the recording identified by the State's expert witnesses as a gunshot. Fisher testified to establish a foundation for the introduction of the recording, and he also testified that the device was capable of recording in several ways, one of which being voice-activated. This testimony was presented at the pretrial hearing and at trial. Additionally, Marr testified that the device was incapable of clearly and conclusively capturing sounds other than voices. Defendant was charged with first degree murder, which as charged in this case, required a finding that he killed an individual without lawful justification and in performing the acts that caused the death, he knew that such acts created a strong probability of death or great bodily harm to that individual or another. 720 ILCS 5/9-1(a)(2) (West 2006). We find that the capability of the recording device or defendant's understanding of how the device worked was not crucial to his defense of the murder charge as that information did not go towards defending any element of the charges against him. See *People v. Shelton*, 401 Ill. App. 3d 564, 575 (2010). Such information was only relevant in establishing the foundation for the admission of the recording and not its weight, as properly determined by the trial court. Moreover, as defense counsel conceded in their motion for sanctions against the State, the fact

that the recorder no longer functioned precluded any further review of it, thus securing an expert to confirm that the device no longer functioned properly would not have been beneficial to defendant. Additionally, at oral argument, defendant's appellate counsel stated that defendant's appointed trial counsel subsequently hired an expert but did not use them at trial, which further speaks to the necessity of the expert as a crucial part of the defense strategy. We conclude that the trial court did not abuse its discretion in denying defendant's request for funds for an expert witness. As such, defendant cannot show that he was prejudiced by the disallowance of funds for an expert witness to test the device, and there is no constitutional violation.

¶ 143    The State argues, as it did in the trial court, that defendant waived this issue for consideration when he later accepted the reappointment of the Public Defender's Office. We decline to address whether the issue was waived based on our conclusions herein.

¶ 144                    G. *Krankel* Inquiry

¶ 145    Finally, defendant contends that the trial court erred when it failed to conduct an inquiry into defendant's pro se claim of ineffective assistance of counsel in his posttrial motion for new trial, pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984).

¶ 146    When a defendant presents a *pro se* claim of ineffective assistance of counsel, the trial court should examine the factual basis of the claim. *People v. Moore*, 207 Ill. 2d 68-77-78 (2003) To accomplish this, the trial court can confer with counsel regarding the facts surrounding the claim or hold a brief discussion with defendant. *People v. Milton*, 354 Ill. App. 3d 283, 292 (2004). The court may also evaluate the claims based on its knowledge of counsel's performance at trial or the insufficiency of the defendant's allegations. *Id.* Where the probe reveals that defendant's allegations are conclusory, misleading, legally immaterial and do not

bring forth a colorable claim of ineffective assistance of counsel, the trial court may be excused from further inquiry. *People v. Burks*, 343 Ill. App. 3d 765, 774 (2003) (citing *People v. Johnson*, 159 Ill. 2d 97, 126 (1994)). After the inquiry, the trial court need not appoint new counsel if it concludes that the ineffectiveness claim is without merit or pertains purely to matters of trial strategy, but should appoint new counsel if the allegations reveal possible neglect. *Moore*, 207 Ill. 2d at 78. If appointed, new counsel would represent defendant on his claims of ineffective assistance and investigate those claims. *Id.*

¶ 147    Here, the record reveals that the trial court did not hold a hearing on defendant's *pro se* claims of ineffective assistance of counsel as alleged in his motion for new trial, because defendant withdrew his *pro se* motion. The trial court specifically inquired as to whether defendant wished to withdraw his *pro se* pleading, and defendant responded affirmatively. A defendant's invitation, agreement, or active participation in the direction of the proceedings and or procedure that he later challenges on appeal goes beyond mere waiver *People v. Villarreal*, 198 Ill. 2d 209, 227 (2001)) and is estopped (*People v. Harvey*, 211 Ill. 2d 368, 385 (2004)). "Under the doctrine of invited error, [a defendant] may not request to proceed in one manner and then later contend on appeal that the course of action was in error." *People v. Carter*, 208 Ill. 2d 309, 319 (2003). As defendant withdrew his pleading containing his allegations of ineffective assistance of counsel in open court, there was no longer any allegation of ineffective assistance pending before the trial court.

¶ 148    Defendant's conclusion that the trial court was obligated to specifically inquire into the allegations raised in the withdrawn *pro se* posttrial motion is incorrect. Illinois caselaw contradicts defendant's claim that the mere filing of a *pro se* posttrial pleading that alleges ineffective assistance of counsel triggers a trial court's obligation to inquire even when such

pleading is later withdrawn in open court. The trial court was under no obligation to *sua sponte* raise the issue of trial counsel's ineffectiveness when such action would have been against defendant's expressed wishes. *People v. Davis*, 337 Ill. App. 3d 977, 988 (2003). Defendant's affirmative act of withdrawing his *pro se* posttrial motion had the effect of telling the trial court that he no longer wanted an examination of his ineffective assistance of counsel claims. Thus, he prevented the trial court from giving him what he now requests- a *Krankel* hearing and invited the alleged error by his own action and prevented substantive review of the matter by the trial court. *People v. McGee*, 345 Ill. App. 3d 693, 699 (2003). Accordingly, defendant has waived the alleged error and is not entitled to appellate review of it. *People v. Allen*, 409 Ill. App. 3d 1058, 1076-78 (2011) (*Krankel* issues presented in a *pro se* letter to the court but not personally presented to the trial court were forfeited).

¶ 149                                    CONCLUSION

¶ 150      In sum, we find that defendant forfeited review of whether the trial court erred in admitting the audio recording under the silent witness doctrine and whether the State argued facts not in evidence because he failed to establish that any error occurred. Additionally, we find that the evidence was sufficient to find defendant guilty beyond a reasonable doubt; the trial court did not err in admitting the audio recording where a proper foundation was laid for its admission and it had probative value; the trial court did not err in failing to impose discovery sanctions on the State regarding the malfunctioned recorder and chip where such malfunction was not intentional and there was no preservation order in place; the trial court did properly admitted evidence of a prior domestic violence incident under section 115-7.4 of the Code; the State did not elicit evidence from witnesses in violation of the trial court's pretrial evidentiary rulings; defendant's right to self-representation was not violated; and the trial court did not err in failing

to consider defendant's *pro se* posttrial claim of ineffective assistance of counsel under *Krankel* where he withdrew the motion from consideration. For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 151    Affirmed.