2024 IL App (1st) 230605-U

No. 1-23-0605

Order filed August 16, 2024

Sixth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 18 CR 6748 |
| | ) | |
| JESSE WILLIAMS, | ) | Honorable |
| | ) | Michael R. Clancy, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE TAILOR delivered the judgment of the court.
Presiding Justice Oden Johnson and Justice C.A. Walker concurred in the judgment.

**ORDER**

¶ 1 *Held*: We affirm defendant's conviction for aggravated unlawful restraint where the evidence was sufficient to prove him guilty beyond a reasonable doubt. Any error from the admission of other crimes evidence was harmless.

¶ 2 Following a bench trial, defendant Jesse Williams was found guilty of aggravated unlawful restraint and sentenced to 24 months' probation. On appeal, Williams argues that the evidence was insufficient to prove him guilty beyond a reasonable doubt and the trial court erred in allowing other crimes evidence. We affirm.

¶ 3 Williams was charged with one count of aggravated kidnapping and one count of aggravated unlawful restraint. The latter count alleged that Williams "knowingly without legal authority detained [S.R.], while using a deadly weapon, to wit: a firearm." See 720 ILCS 5/10-3.1 (West 2018).

¶ 4 Prior to trial, the State filed a motion pursuant to section 115-7.4 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-7.4 (West 2018)) seeking to admit other crimes evidence of domestic violence incidents involving C.D., Williams's ex-wife, to prove Williams's motive, state of mind, intent, continued hostility, and propensity to commit domestic violence.

¶ 5 The State asserted that after Williams and C.D. married in August 2011, Williams punched C.D. in the mouth during their honeymoon in the Bahamas. Additionally, the State sought to introduce evidence that in February 2012, Williams became aggressive and angry during an argument and blamed C.D. over the failed purchase of a home. Williams grabbed a firearm from a closet, which caused C.D. to run out of the home. C.D. returned after Williams called her and told her he would not do anything but shoot the firearm outside.

¶ 6 Williams objected to the other crimes evidence, arguing neither incident was proximate in time or factually similar to the charged offense, and both were more prejudicial than probative. Following a hearing, the trial court allowed the State to introduce both incidents for motive, state of mind, intent, and propensity, finding the probative value outweighed the prejudicial effect.

¶ 7 At trial, S.R. testified that on April 15, 2018, a couple of weeks after she and Williams married, they argued in S.R.'s apartment about Williams being "controlling." Williams, a police officer in Dolton at the time, did not live with S.R. The argument lasted into the morning of April

16, 2018. S.R. wanted Williams to leave her apartment, but he refused. She was upset and threw his clothes out of her bedroom window.

¶ 8    The couple went to sleep and continued arguing after they woke up. Williams threatened to retrieve a firearm from his vehicle and "blow [S.R.'s] brains out." S.R. immediately called 911. Williams then ran out of the front door naked, and S.R. locked that door. Less than five minutes later, Williams entered through the back door pointing a black, semiautomatic firearm forward. He backed S.R. into the bathroom with the firearm pointed at her. Williams then pushed S.R. toward the bathtub where she fell in, and he continued to point the firearm at her head. S.R. heard the police knocking at the door and yelled for help. Williams placed his hand over S.R.'s mouth, told her to "shut the f*** up before he [blew her] brain[s] out" and pointed the firearm at S.R.'s temple.

¶ 9    Once Williams removed his hand from S.R.'s mouth, she yelled "help me" and for the police to "kick the door in." Williams still pointed the firearm at her head and was telling her to "shut up." He was between S.R. and the partially opened bathroom door with his back facing the door. S.R. did not try to leave the bathroom because she was "terrified" and did not know Williams's state of mind or if he would kill her. Williams eventually removed the firearm from S.R.'s head and unloaded the clip. He stated he would lose his job and that he "messed up." He walked toward S.R.'s bedroom, and S.R. opened the front door for the police. About 15 or 20 minutes had elapsed from the time she was backed into the bathroom until Williams unclipped the firearm and walked out of the bathroom. S.R. told an officer what happened and the police handcuffed Williams.

¶ 10    The State moved to publish and enter a recording of the 911 call, which the court permitted over Williams's objection. The recording is included in the record on appeal, and this court has

listened to the audio. On the audio, S.R. tells an operator that Williams threatened to retrieve a firearm from his vehicle and shoot her. She states that she is afraid for her life.

¶ 11    On cross-examination, S.R. denied not informing the police that Williams forced her into the bathroom with the firearm. She reiterated that she told the police that Williams said he would blow her brains out and held a firearm to her head. On redirect examination, S.R. stated Williams did not physically push her into the bathroom, but he pointed the firearm at her and she backed into the bathroom.

¶ 12    Former Chicago police officer Krzysztof Kobylarczyk testified that on April 16, 2018, at around 1:55 p.m., he responded to a domestic disturbance call at a residence involving a Dolton police officer. When Kobylarczyk was 200 to 300 feet from the residence, he noticed a naked black male enter the driver's side of a black Lincoln and "quickly run" eastbound along the apartment building.

¶ 13    Kobylarczyk then walked up the back steps of the apartment building to the third floor. He approached the back door of the apartment, knocked, announced his office, and heard a female voice "cry for help." Officer John Pietryla joined Kobylarczyk, and they knocked "multiple times" and heard a female voice calling for help "multiple times." Chicago police sergeant Rafael Martinez and Officer Andrew Ohlson also arrived on scene.

¶ 14    Kobylarczyk knocked until S.R. opened the door, and then he entered the residence. From the time Kobylarczyk first knocked on the door until S.R. opened it, a little over 20 minutes had elapsed. Ohlson and the other officers entered through the front door. S.R. appeared "scared" and started crying while describing the incident. Another individual, whom Kobylarczyk identified as Williams in court, was also inside the residence.

¶ 15    Kobylarczyk found two firearms—a revolver and a black semiautomatic—inside a fanny pack in the bedroom. A wallet with a Dolton police star and identification belonging to Williams were also inside the fanny pack. S.R. identified the semiautomatic as the firearm Williams used during the incident. Kobylarczyk ran the plate on the black Lincoln and learned it was registered to Williams.

¶ 16    The State published footage from Kobylarczyk's in-vehicle camera and body-worn camera (BWC), which is included in the record on appeal and this court has viewed. The in-vehicle camera footage depicts Kobylarczyk's vehicle pull behind a black Lincoln. In the BWC footage, Kobylarczyk knocks on the door and a female voice yells, "help."

¶ 17    On cross-examination, Kobylarczyk clarified he could neither see what Williams was doing nor if he was carrying anything when he ran from the vehicle. S.R. told Kobylarczyk that Williams pushed her into the bathtub, put his hand over her mouth, and placed the firearm to the front of her head. He did not recall S.R. stating that she was "backed" into the bathroom, that Williams told her that he would "blow her brains out," that Williams held the firearm to her temple, or that Williams said he "didn't want to make this any worse than it had already been."

¶ 18    Ohlson testified that he and his partner responded to the back of the apartment building, spoke with Kobylarczyk, and then relocated to the front of the building and went to the third floor. Ohlson knocked on S.R.'s apartment door and heard a female voice say, "kick it in." Ohlson knocked again, announced his office, and a female, later identified as S.R., opened the door. He immediately asked her "where he was at." A naked male, whom Ohlson identified as Williams in court, came to the door and was detained. About 16 minutes had elapsed between the time Ohlson arrived on scene to when S.R. opened the door.

¶ 19    The State published and entered Ohlson's BWC footage, which is included in the record on appeal and this court has viewed. In the footage, officers knock on the door and S.R. yells for them to "kick the door in, please." After another knock about 15 seconds later, S.R. opens the door and Williams walks up beside her with his hands raised.

¶ 20    C.D. testified that she and Williams married in August 2011, and were married for approximately 1½ years. Three days after they were married, while in their home, C.D. and Williams had a disagreement and Williams punched C.D. in the mouth, causing a "busted lip" which bled and left a mark for "some days." C.D. did not go to the police. Two days later, she went on her honeymoon to the Bahamas with Williams.

¶ 21    Around 10 p.m. on March 5, 2012, while C.D. and Williams were still married and at their home, they had a disagreement about making an offer on a home. Williams started "yelling" and punching the desk and monitor in his office. C.D. was afraid because Williams was loud and acting in an "aggressive manner." He eventually entered the bedroom where C.D. was and grabbed a firearm from the closet. C.D. then ran out of the home. Williams called C.D. 10 to 15 minutes later and told her he would not shoot her, but he would shoot outside in the backyard. C.D. eventually returned home. She did not call the police, explaining that Williams was a police officer and she "didn't really trust" police officers at the time.

¶ 22    On cross-examination, C.D. clarified that she originally stated that the March 5, 2012, incident occurred in February 2012. Williams said nothing to C.D. when he grabbed the firearm or pointed it at her before she ran out of the home. C.D. also clarified that she originally stated Williams punched her while on their honeymoon in the Bahamas. She stayed for the entire trip and did not take any pictures or document her injuries.

¶ 23    Williams testified he had previously worked as a Dolton police officer for approximately ten and a half years. On April 16, 2018, at around 12:30 p.m., he was at S.R.'s apartment and they were in bed. S.R. was scrolling on her phone and "made a threat" at Williams. She then began "digging" through a clothing hamper in the closet, turned, and pointed a dark-colored revolver at Williams. S.R. stated, "is this what you want?" Williams attempted to take the firearm from her.

¶ 24    Williams was present when S.R. called 911. S.R. still had the firearm in her hand and pointed at Williams. After S.R. made the call, Williams ran out the front door to his vehicle and retrieved his fanny pack. He wanted his credentials and to "gain control" over the situation. Williams explained that he did not want S.R. to hurt herself or for the police, who were on the way, to hurt her. After retrieving his fanny pack, he entered the apartment through the back door. S.R. was standing near the front door holding the firearm.

¶ 25    Williams ran to take the firearm from S.R. She turned toward him, held the firearm with both hands, and pointed it at him saying, "come on." S.R. ran to the bathroom, and Williams followed her. Williams wanted to retrieve the firearm from S.R. because she was "unstable." S.R. was pushing on one side of the bathroom door, while Williams was pushing on the opposite side of the door. Williams pushed the bathroom door open, which caused S.R. to fall into the bathtub and drop the firearm, which Williams retrieved. Williams then helped S.R. out of the bathtub, they discussed the incident, and heard the police knocking on the door. Williams was not blocking the door to the bathroom.

¶ 26    Williams grabbed S.R.'s hand to lead her to the door, and she said, "help, help." He released her hand. Williams retrieved his fanny pack from the kitchen, put the firearm inside it, and put the fanny pack in the bedroom.

¶ 27    Williams then went to open the back door for the police. S.R. was behind him, but she deviated and went to open the front door. When he realized that S.R. was not walking with him, he turned and walked toward the front door. S.R. uttered, "kick the door in." Williams replied, "there's *** no need for all of that." Williams had his hands raised when the door was opened.

¶ 28    Williams denied pushing S.R. into the bathroom or bathtub, holding his hand over her mouth, holding the firearm to her head, pointing the firearm at her, threatening to kill her, preventing her from leaving the bathroom, or preventing her from leaving the apartment.

¶ 29    On cross-examination, Williams did not recall telling the officers that he never left the apartment. He did not run to a neighbor or call 911 himself. Nor did he remain in his vehicle or drive away, testifying that he was concerned for S.R.'s well-being. Williams did not tell the responding officers that S.R. pointed a firearm at him.

¶ 30    The trial court found Williams guilty of aggravated unlawful restraint and not guilty of aggravated kidnapping. The court found S.R.'s testimony credible and corroborated by the testimony of other witnesses, the 911 call, the BWC footage, and Williams's actions. It also found the extended length of time that the officers were outside S.R.'s apartment corroborated that S.R. was "kept in the bathroom," "restrained," and threatened "with a gun to her head."

¶ 31    The court found Williams's testimony "incredible, not believable, nonsensical, and really ridiculous." The court noted that when Williams, a "trained officer of ten years," left the apartment, he did not wait for the police to arrive to inform them that S.R was armed, did not call the police himself, and did not tell anyone that S.R. was in the apartment and threatened him with a firearm. Rather, Williams claimed "he return[ed] to an apartment with an armed individual who ha[d] recently threatened to harm him." The court found "absolutely ridiculous" Williams's testimony

that when he re-entered the apartment with an armed assailant, he entered with his firearm in a zipped fanny pack. Regarding the other crimes evidence, the court commented that C.D.'s testimony was "relevant to motive and intent" in "illustrat[ing] how [Williams] [could] react when he's angry with his spouse over a missed home purchase."

¶ 32    The court sentenced Williams to 24 months' probation. Williams filed a motion for a new trial contesting the admission of the other crimes evidence, which was denied. Williams appealed.

¶ 33    On appeal, Williams challenges the sufficiency of the evidence establishing his guilt of aggravated unlawful restraint beyond a reasonable doubt.

¶ 34    In considering a challenge to the sufficiency of the evidence, the relevant inquiry is " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. McLaurin*, 2020 IL 124563, ¶ 22 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). This court will not retry the defendant. *People v. Nere*, 2018 IL 122566, ¶ 69. The trier of fact's role is to "assess the credibility of the witnesses, weigh the evidence presented, resolve conflicts in the evidence, and draw reasonable inferences from the evidence." *People v. Daniel*, 2022 IL App (1st) 182604, ¶ 102. A reviewing court will not substitute its judgment for that of the trier of fact with respect to those issues. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224-25 (2009).

¶ 35    The trier of fact need not "disregard inferences that flow normally from the evidence before it" or "search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt." *People v. Jackson*, 2020 IL 124112, ¶ 70. Therefore, we "must allow all reasonable inferences from the record in favor of the prosecution." *People v. Givens*, 237 Ill. 2d

311, 334 (2010). A conviction will not be set aside unless "the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt." *People v. Bradford*, 2016 IL 118674, ¶ 12.

¶ 36    To find Williams guilty of aggravated unlawful restraint as charged, the State needed to prove that Williams "knowingly without legal authority detain[ed]" S.R. while "using a deadly weapon." 720 ILCS 5/10-3, 10-3.1 (West 2018). Actual or physical force is not required, "so long as the individual's freedom of movement is impaired." *People v. Lee*, 376 Ill. App. 3d 951, 958 (2007).

¶ 37    Viewing the evidence in the light most favorable to the State, a rational trier of fact could have found Williams guilty of aggravated unlawful restraint. Williams threatened S.R. that he would retrieve a firearm from his vehicle and "blow [her] brains out." He exited the front door to retrieve a fanny pack, which held his firearm, from his vehicle. Williams then entered the apartment through the back door with a firearm pointed forward and confined S.R. to the bathroom where he held that firearm to her head. S.R. testified that Williams backed her into the bathroom where she fell into the bathtub, stood between her and the partially opened bathroom door, placed his hand over her mouth, and held a firearm to her head. She repeatedly cried for help from the police, who were knocking at the door to her apartment. The trial court found S.R.'s testimony credible, a determination we will not reassess. *Siguenza-Brito*, 235 Ill. 2d at 224-25 (a reviewing court will not substitute its judgment for that of the trial court with respect to credibility issues).

¶ 38    S.R.'s testimony was corroborated by responding officers. Kobylarczyk testified that before he entered the building, he observed a naked black man, identified as Williams, enter a vehicle and then "quickly run" alongside the building. He heard S.R. yell "help" multiple times

when he knocked on the back door of her apartment, and she did not open the door for about 20 minutes. He recovered a fanny pack from the bedroom that contained Williams's identification and two firearms, one of which S.R. identified as the firearm that Williams held to her head. Ohlson testified that he heard S.R. say, "kick it in" when he knocked on the front door of her apartment, and she did not open the door until around 16 minutes after he arrived on scene.

¶ 39   The 911 audio, in-vehicle camera footage, and BWC footage also corroborates S.R.'s testimony. On the 911 audio, S.R. tells the operator that Williams threatened to retrieve a firearm from his vehicle and shoot her. Kobylarczyk's in-vehicle footage shows him pull behind a black Lincoln that was registered to Williams. The BWC footage shows Kobylarczyk knocking on S.R.'s back door and S.R. is heard yelling "help" multiple times. The footage also shows Ohlson knocking on S.R.'s front door and S.R. is heard yelling, "kick the door in." Williams's actions also corroborate S.R.'s testimony, as Williams retrieved his fanny pack from his vehicle and returned to the apartment before the police arrived.

¶ 40   Construing the evidence in the light most favorable to the State, a rational trier of fact could find Williams guilty of detaining S.R. without legal authority while using a deadly weapon. Despite knowing that police were responding to S.R.'s 911 call, Williams did not open the door to the officers' repeated knocks. Instead, S.R. opened the door 15 to 20 minutes after Ohlson and Kobylarczyk first knocked. The length of time it took S.R. to answer the door supports the reasonable inference that Williams detained S.R. in the bathroom using a firearm that he retrieved from his vehicle. See *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004) (all reasonable inferences are viewed in the light most favorable to the prosecution). We therefore find that the evidence was sufficient to find Williams guilty beyond a reasonable doubt of aggravated unlawful restraint.

¶ 41   Nevertheless, Williams argues there was no physical evidence that he committed a crime and the witness testimony was unreliable, inconsistent, and uncorroborated. Specifically, Williams alleges S.R.'s version of events was inconsistent with the 911 call where Williams did not kick her door down or shoot her, and she used more "sensational" language in describing the incident at trial than when she spoke to the police at the scene.

¶ 42   The State, however, is not required to present physical evidence to sustain a conviction, and the testimony of a single witness, if positive and credible, is sufficient evidence to convict. *People v. Hill*, 2023 IL App (1st) 150396, ¶ 23. Although Williams questions S.R.'s testimony, it is the trial court's responsibility to resolve any inconsistencies in the testimony, and even contradictory testimony does not necessarily render a witness incredible. See *Daniel*, 2022 IL App (1st) 182604, ¶ 102; *People v. Gray*, 2017 IL 120958, ¶ 47. Williams is requesting this court second-guess the trial court's credibility determinations, which we cannot do. See *Siguenza-Brito*, 235 Ill. 2d at 224-25.

¶ 43   Moreover, in assessing witness credibility, the trial court found S.R.'s testimony credible and found "absolutely ridiculous" Williams's testimony that S.R. held a firearm at him, he retrieved his fanny pack to gain control of the situation and to retrieve his police credentials, he did not threaten S.R. with his firearm, and he entered the bathroom after S.R. because he feared for her safety. It is not this court's function to reweigh the evidence. *People v. Leak*, 398 Ill. App. 3d 798, 818 (2010). Here, we do not find "the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt." *Bradford*, 2016 IL 118674, ¶ 12.

¶ 44     Williams next contends that the trial court erred in allowing other crimes evidence, because C.D.'s testimony was irrelevant to the charged offense, admitted for improper purposes, lacked probative value, and was highly prejudicial. He argues that C.D.'s testimony was inadmissible and bolstered S.R.'s otherwise unsubstantiated and inconsistent testimony.

¶ 45     Usually, evidence of other crimes is not admissible to prove a defendant's propensity to commit a crime. *People v. Jackson*, 2014 IL App (1st) 123258, ¶ 40. However, evidence of other crimes may be admitted for certain purposes other than propensity when such evidence is relevant, as "relevance is a threshold requirement that must be met by every item of evidence." *People v. Dabbs*, 239 Ill. 2d 277, 283, 289 (2010). Some of these purposes include "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). Section 115-7.4 of the Code also allows for, in cases involving incidents of domestic violence, the admission of evidence of the defendant's commission of a similar offense to "be considered for its bearing on any matter to which it is relevant." 725 ILCS 5/115-7.4(a) (West 2018).

¶ 46     In assessing the admissibility of other crimes evidence, the evidence should not be admitted if the probative value is substantially outweighed by the prejudicial effect. *People v. Pikes*, 2013 IL 115171, ¶ 11. In weighing the probative value of other crimes evidence against undue prejudice to the defendant, the court may consider (1) the proximity in time to the charged or predicate offense, (2) the degree of factual similarity to the charged or predicate offense, and (3) other relevant facts or circumstances. 725 ILCS 5/115-7.4(b) (West 2018). The admissibility of other crimes evidence is within the discretion of the trial court, and the decision will not be disturbed absent an abuse of discretion. *Pikes*, 2013 IL 115171, ¶ 12. A trial court abuses its discretion where

its ruling is arbitrary, fanciful, or where no reasonable person would take the view adopted by the trial court. *People v. Becker*, 239 Ill. 2d 215, 234 (2010).

¶ 47    Even assuming, *arguendo*, that the trial court abused its discretion in admitting other crimes testimony, any such error was harmless. See *People v. Clark*, 2015 IL App (1st) 131678, ¶ 65 (reversal is not required where the admission of erroneous other crimes evidence is harmless beyond a reasonable doubt). To determine whether an error is harmless beyond a reasonable doubt, we must determine whether the other crimes evidence was a material factor in the conviction such that without the evidence, the outcome of trial would have been different. *Id.* The erroneous admission of other crimes evidence is harmless when a defendant is "neither prejudiced nor denied a fair trial because of its admission." *People v. Jacobs*, 2016 IL App (1st) 133881, ¶ 78.

¶ 48    Here, the outcome of Williams's trial would not have been different had the other crimes evidence not been admitted. The court mentioned the other crimes evidence only briefly in its findings. Moreover, there was substantial evidence of Williams's guilt independent of the other crimes evidence including S.R.'s testimony, the responding officers' testimony, the 911 audio, the BWC footage, the in-vehicle footage, and the length of time it took S.R. to answer the officers' knocks at her door. Because C.D.'s testimony was not a material factor in the trial court finding Williams guilty of aggravated unlawful restraint, any error in its admission was harmless.

¶ 49    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 50    Affirmed.