2025 IL App (1st) 232331-U

No. 1-23-2331

Order filed October 16, 2025

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 21 CR 8607 |
| | ) | |
| ANTHONY MONEYHAM, | ) | Honorable |
| | ) | Steven G. Watkins, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE NAVARRO delivered the judgment of the court.
Justices Lyle concurred in the judgment.
Justice Ocasio dissented.

**ORDER**

¶ 1     *Held*:  We affirm defendant's conviction for aggravated battery by strangulation where the evidence was sufficient to prove that he knowingly strangled the victim.

¶ 2     Following a bench trial, defendant Anthony Moneyham was found guilty of aggravated battery by strangulation and sentenced to four years' imprisonment. On appeal, defendant argues that the evidence did not establish that he strangled the victim because her testimony was incredible

and defendant could not have acted with the requisite mental state because he was acting abnormally and suffering from mental illness. We affirm.

¶ 3 Defendant was charged by indictment with one count of vehicular invasion (720 ILCS 5/18-6(a) (West 2020)), two counts of aggravated battery of a peace officer (720 ILCS 5/12-3.05(d)(4)(iii) (West 2020)), one count of aggravated battery by strangulation (720 ILCS 5/12-3.05(a)(5) (West 2020)), two counts of aggravated battery on a public way (720 ILCS 5/12-3.05(c) (West 2020)), and one count of burglary (720 ILCS 5/19-1(a) (West 2020)). Prior to trial, the State dismissed the vehicular invasion count. The matter proceeded to a bench trial.

¶ 4 At trial, Tatiana Cain testified that on June 1, 2021, she was employed as a public safety officer at Loretto Hospital. Her shift began at 10 p.m. the night before and ended at 6:30 a.m. on June 1. She was in uniform that day. Hospital protocol specified that patients brought into the emergency room complete paperwork within two hours prior to seeing a doctor; otherwise, they would be escorted from the hospital.

¶ 5 Around two hours prior to the end of Cain's shift, Cicero emergency medical technicians (EMTs) brought defendant, whom she identified in court, into the hospital. Defendant received the necessary paperwork and Cain instructed him to complete it. Cain approached defendant again to tell him to complete the paperwork, but defendant just "looked at" Cain and "didn't say anything." Cain approached defendant again to tell him to complete the paperwork or he would be escorted from the premises.

¶ 6 Cain then went to her vehicle, which was parked on a street outside the main entrance of the hospital, to start it and retrieve something. Then, she entered the hospital to inform the incoming shift personnel that defendant was in the waiting room and had not completed his

paperwork. She believed her vehicle was locked when she returned to the hospital. After Cain informed her colleague that defendant had not completed the paperwork, he was escorted from the hospital.

¶ 7    Five minutes later, Cain exited the hospital and went to her vehicle. She entered the driver's seat, closed her door, and was about to put her key into the ignition when "someone grabbed [her] from the back" and "put pressure on [her] neck" with their hands around her throat. Cain was gasping for air. She looked in the rearview mirror and saw defendant in the "back seat behind her." Cain struck defendant. She exited the vehicle, went to the back passenger side door, told defendant to exit, and grabbed him to remove him. Defendant and Cain hit each other and Cain banged on the hospital window to alert security. Security eventually helped Cain remove defendant from the vehicle.

¶ 8    Cain explained that she opened the back passenger side door instead of the back driver's side door where defendant sat because vehicles would "speed" through the area where her vehicle was parked. She also believed that hospital security would see her through the window on the passenger side of her vehicle. Defendant was still seated on the back driver's side when Cain opened the door to remove him. Cain noticed that defendant had defecated in her vehicle.

¶ 9    Cain testified that defendant's contact with her neck was unwanted and she felt violated. She had scarring and redness on her neck and soreness due to the attack. She did not seek medical attention. Cain stated that her emotions were "everywhere" and she was "upset," "scared," and "afraid" due to the incident.

¶ 10    Surveillance cameras outside of the hospital captured the events and the video was published at trial. Cain identified herself, defendant, and her vehicle in the video. That video was furnished on appeal and this court has viewed it.

¶ 11    The video is filmed from an elevated position and depicts Cain's vehicle from the left side. A pillar obscures the trunk of the vehicle and a wall obscures the front half of the vehicle. In the video, Cain exits the hospital and goes to the driver's side and back passenger side of her vehicle, which has tinted windows, before returning to the hospital. Around a minute later, defendant exits the hospital. He attempts to enter a vehicle parked behind Cain's vehicle, but fails. He then opens the back passenger door of Cain's vehicle, enters, and closes the door.

¶ 12    Cain exits the hospital five minutes later and walks to the driver's side of her vehicle. She enters, leaves the door open for a short time, closes the door, and exits seconds later. She hurriedly walks to the back passenger side and opens the door. Defendant appears to be slumped over in the back of the vehicle. Cain attempts to remove defendant from the vehicle, gestures toward the hospital window, and removes defendant halfway from her vehicle. Hospital personnel and security exit the hospital seconds later and help to fully remove defendant, who is then handcuffed and taken away.

¶ 13    On cross-examination, Cain stated that defendant seemed "a little off like he was high off something" during their interactions inside the hospital. Defendant "didn't say anything to anyone" and Cain thought he was deaf. Cain clarified that defendant attacked her after she entered her vehicle and closed the door. Defendant was in the seat "directly behind" her. She punched defendant two times in order to free herself and exited her vehicle "pretty fast." Cain's injuries

were not photographed. Defendant was "hitting" Cain by "pushing his leg" while Cain was trying to pull him from her vehicle.

¶ 14 On redirect examination, Cain stated that she could not see defendant in the back of her vehicle because the windows were tinted. Cain's vehicle was visible from defendant's location inside the waiting room.

¶ 15 David Otero, a public safety officer at Loretto Hospital, testified that he worked from 6 a.m. to 2:30 p.m. on June 1, 2021, after taking over Cain's shift. He observed defendant, whom he identified in court, sitting in the waiting room at 6 a.m. Later, Otero responded to a call for assistance outside the hospital, saw other officers attempting to remove defendant from near Cain's vehicle, and assisted in placing defendant in custody. Cain was "nervous," acting "not like her," and "choked up" about what had occurred.

¶ 16 Defendant testified that he learned a few months after the incident that he was taken to Loretto Hospital on June 1, 2021. He "wasn't aware that day" and had no memory of it. Defendant found a slip from Cicero paramedics detailing that he was taken to the hospital by Cicero police after he had been "pulling on car doors" and having a "mental breakdown." He remembered the police asking him what he was doing, telling them he was going home because he had just been released from county jail after being arrested the night before, and buying cigarettes from a restaurant "across the street from a Planet Fitness." At the hospital, he only remembered a woman "yell[ing]" at him to sign papers or leave. Next, he remembered being handcuffed. He had no memory of the altercation with Cain even after watching the surveillance video.

¶ 17     On cross-examination, defendant stated that he did not suffer from amnesia and had "never had that problem before." To his knowledge, he was never treated by a doctor at the hospital and did not pass out while there.

¶ 18     Following closing arguments, the trial court found defendant not guilty of aggravated battery of a peace officer because the evidence did not establish that defendant saw Cain's uniform in order to know that she was a security officer. The court found defendant guilty of aggravated battery by strangulation and on a public way and of burglary. In ruling, the court found that Cain testified credibly and that defendant entered Cain's vehicle without authority with the intent to commit an aggravated battery therein.

¶ 19     Defendant filed a motion to reconsider and for a new trial, which the court denied. At sentencing, the court merged the aggravated battery on a public way and burglary counts into the aggravated battery by strangulation count and imposed four years' imprisonment.

¶ 20     On appeal, defendant first argues that the evidence did not establish that he strangled Cain because her testimony was incredible.

¶ 21     On a challenge to the sufficiency of the evidence, the relevant inquiry is " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. McLaurin*, 2020 IL 124563, ¶ 22 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). This court will not retry the defendant. *People v. Nere*, 2018 IL 122566, ¶ 69. The trier of fact's role is to "assess the credibility of the witnesses, weigh the evidence presented, resolve conflicts in the evidence, and draw reasonable inferences from the evidence." *People v. Daniel*, 2022 IL App (1st) 182604, ¶ 102. A reviewing court will not substitute its judgment for

that of the trier of fact regarding those issues. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224-25 (2009).

¶ 22 The trier of fact need not "disregard inferences that flow normally from the evidence before it" or "search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt." *People v. Jackson*, 2020 IL 124112, ¶ 70. Therefore, we "must allow all reasonable inferences from the record in favor of the prosecution." *People v. Givens*, 237 Ill. 2d 311, 334 (2010). A conviction will not be set aside unless "the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt." *People v. Bradford*, 2016 IL 118674, ¶ 12.

¶ 23 To prove defendant guilty of aggravated battery by strangulation, the State needed to prove that defendant "knowingly without legal justification by any means (1) cause[d] bodily harm to an individual or (2) ma[d]e physical contact of an insulting or provoking nature with an individual" through strangulation. 720 ILCS 5/12-3(a), 12-3.05(a)(5) (West 2020). Strangling is defined as "intentionally impeding the normal breathing or circulation of the blood of an individual by applying pressure on the throat or neck of that individual or by blocking the nose or mouth of that individual." 720 ILCS 5/12-3.05(i) (West 2020).

¶ 24 Viewing the evidence in the light most favorable to the State, a rational trier of fact could have found that defendant strangled Cain in her vehicle. Cain testified that when she entered her vehicle, someone behind her grabbed her neck and applied pressure to the point she was gasping for air. She looked in the rearview mirror and saw defendant. The trial court found Cain's testimony credible, a determination we will not reassess. *Siguenza-Brito*, 235 Ill. 2d at 224-25. Cain's testimony that defendant strangled her is sufficient to support a conviction as the "testimony

of a single witness, if positive and credible, is sufficient to convict." *People v. Hill*, 2023 IL App (1st) 150396, ¶ 23.

¶ 25    Further, there was evidence supporting other aspects of Cain's testimony. Otero testified that he saw defendant being removed from Cain's vehicle and that Cain was "choked up" and nervous. The video corroborated that defendant entered Cain's vehicle before her and was not visible through the tinted windows. The video also showed Cain hurriedly exiting her vehicle and approaching defendant in the backseat to remove him from the vehicle. Based on the evidence at trial, the trial court could rationally conclude that defendant committed aggravated battery against Cain by strangling her in her vehicle.

¶ 26    Nevertheless, defendant contends that the video contradicts Cain's testimony, rendering it incredible. Cain stated that the attack occurred after she closed the door to her vehicle mere seconds before she exited and confronted defendant in her backseat. Defendant contends that the video shows him slumped over in the back passenger side seat instead of the back driver's side seat where Cain testified defendant sat, and neither Cain nor defendant acted as if an altercation had just occurred.

¶ 27    Contrary to defendant's contentions, the video does not contradict Cain's testimony regarding the attack because the actual attack is not visible on the video. Moreover, to the extent that there existed inconsistencies in Cain's testimony, it was the trial court's responsibility to resolve them and even contradictory testimony does not necessarily render a witness incredible. See *Daniel*, 2022 IL App (1st) 182604, ¶ 102; see also *People v. Gray*, 2017 IL 120958, ¶ 47. The trial court found Cain to be credible. Defendant is requesting this court second-guess the trial court's credibility determinations, which we cannot do. See *Siguenza-Brito*, 235 Ill. 2d at 224-25.

¶ 28    To the extent that defendant challenges Cain's demeanor in response to the attack, Cain testified that she was upset and scared. Otero described Cain as nervous, "choked up," and not acting like herself. Moreover, the video shows Cain quickly exiting her vehicle to confront and remove defendant as well as signaling to hospital staff for assistance, which was immediately rendered. Therefore, we cannot agree that her actions disprove her testimony as to the altercation.

¶ 29    Next, defendant argues that even if Cain testified credibly, he could not have acted with the requisite mental state because he was acting abnormally and suffering from mental illness. Specifically, defendant argues that the evidence failed to establish that he knowingly strangled Cain because Cain, police, and paramedics all believed that defendant was suffering from a "physical or mental issue" and needed a psychiatric evaluation.

¶ 30    A defendant acts with knowledge of "[t]he nature or attendant circumstances of his or her conduct, described by the statute defining the offense, when he or she is consciously aware that his or her conduct is of that nature or that those circumstances exist." 720 ILCS 5/4-5(a) (West 2020). A defendant also acts with knowledge of "[t]he result of his or her conduct, described by the statute defining the offense, when he or she is consciously aware that that result is practically certain to be caused by his conduct." *Id*. § 4-5(b). Knowledge is often proven through circumstantial evidence, rather than direct proof. *People v. Lattimore*, 2011 IL App (1st) 093238, ¶ 44. A defendant "need not admit knowledge for the trier of fact to conclude that he acted knowingly." *People v. Penning*, 2021 IL App (3d) 190366, ¶ 19. Knowledge can be inferred from the surrounding facts and circumstances. *People v. Frazier*, 2016 IL App (1st) 140911, ¶ 23.

¶ 31    It is a reasonable inference from the evidence that defendant was aware of his actions when he entered Cain's vehicle and strangled her from behind. He was brought to the hospital by police

after being seen pulling on vehicle doors. The video shows that when defendant left the hospital, he again pulled on vehicle doors, first attempting to enter a vehicle behind Cain's and then successfully entering Cain's. While defendant testified that he had no memory of the altercation with Cain, he recalled other facts preceding the altercation including his arrest the night before, his encounter with police, buying cigarettes near a Planet Fitness, and being "yelled" at by Cain to complete the forms. Defendant also testified that he did not suffer from amnesia at the time of the altercation and that had never been an issue for him. Given this evidence, his contention that he was suffering from mental illness that rendered his actions in strangling Cain unknowing is speculative and insufficient to raise a reasonable doubt of his guilt. See *People v. Phillips*, 215 Ill. 2d 554, 574 (2005) ("mere possibilities or speculation are insufficient to raise reasonable doubt"). The surrounding facts and circumstances support the inference that defendant knowingly entered Cain's vehicle and strangled her. See *Frazier*, 2016 IL App (1st) 140911, ¶ 23.

¶ 32    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 33    Affirmed.

¶ 34    JUSTICE OCASIO, dissenting:

¶ 35    For the reasons that follow, I believe the decision of the trial court to find Moneyham guilty beyond a reasonable doubt was incorrect and should be reversed. I respectfully dissent from the majority's decision.

¶ 36    At approximately 4:30 a.m. on Tuesday, June 1, 2021, Moneyham was walking the streets and experiencing a mental health episode. As frequently occurs in such situations, the police were called to assist. The Cicero police responded and arranged for him to be taken to Loretto Hospital on the west side of Chicago.

¶ 37 Tatiana Cain, a public safety officer at Loretto Hospital, was working the night shift from 10 p.m. the previous evening until 6:30 a.m. on June 1. During this time, Cain was also apparently responsible for performing some kind of intake duty, instructing incoming patients to complete the necessary paperwork in order to be seen by a doctor. It appears that Moneyham did not respond to these instructions. It is unclear from the record whether Cain was informed that Moneyham required a psychiatric evaluation. Despite repeated reminders from Cain, Moneyham remained silent and did not complete the paperwork. Consequently, before the end of her shift, Moneyham was escorted out of the hospital's emergency room for not having completed the necessary documentation.

¶ 38 Once outside, Moneyham approached a vehicle parked on the street and attempted to open the door, seemingly to check if it was unlocked. Finding the first car locked, he proceeded to another vehicle, Cain's car, which was unlocked. It should be noted that Cain had gone to her car to start it and retrieve an item. There is no indication in the record suggesting Moneyham was aware of the ownership of the car. Cain's car had tinted windows, so the video footage does not reveal what transpired once Cain returned to and entered her vehicle.

¶ 39 The only evidence presented at trial that Moneyham strangled Cain was Cain's testimony that, after she got into her car, Moneyham grabbed her from behind and started choking her. The question, then, is whether that testimony was sufficient under the *Jackson* standard. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979). A single witness's testimony is sufficient to sustain a conviction "if the testimony is positive and credible." *People v. Gray*, 2017 IL 120958, ¶ 37. Under *Jackson*, then, the question whether the evidence at trial as a whole allowed the trier of fact to "reasonably accept the testimony as true beyond a reasonable doubt." *Cunningham*, 212 Ill. 2d at

279. Cain's testimony was insufficient to sustain Moneyham's conviction only if "the record evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt." *Id.* at 280.

¶ 40    My review of the record reveals three significant ways in which Cain's credibility was undermined by the other evidence at trial, even when the evidence is viewed in the light most favorable to the State.

¶ 41    First, Cain's testimony about what transpired inside the car while she was in the driver's seat verges on implausible in light of the security footage, which shows that those events would have taken place over a span of time that lasted less than two seconds. The timestamps recorded on the video reflect that the time that elapsed between Cain fully closing the driver's door and Cain starting to open it again was no more than 1.651 seconds.[1] According to Cain's testimony, during that time, she reached for the ignition, Moneyham grabbed her throat and started choking her to the point she was gasping for air, she looked in the rearview mirror and discerned it was him, and she punched him twice, allowing her to open the door and get out of the car. Could all that have happened in that time? Maybe, but even if it is conceivably possible that all those things took place in less than two seconds, the short span of time between Cain closing her door and then opening it again is much better explained by something simpler happening inside the car, such as Cain noticing that there was a stranger in her back seat and nothing more.

¶ 42    The State argues that the trial court could have inferred that the sequence described by Cain started before she closed her driver's side door. But that would require discrediting Cain's specific

---

[1] Specifically, at timestamp 6:36:26.386, the security footage shows Cain's door still slightly ajar as it closes. At timestamp 6:36:38.037, the footage shows Cain's door again slightly ajar as it starts to open again.

testimony that Moneyham did not grab her until after she closed her door while accepting the remainder of her account. More significantly, it would require believing that, in the midst of being choked from behind and trying to fight off her assailant with her fist, Cain decided to close the door that she was trying to escape through. Although we view the evidence in the light most favorable to the State and therefore draw all reasonable inferences in its favor, we may not draw unreasonable inferences. *Cunningham*, 212 Ill. 2d at 280. And this proposed inference is not reasonable.

¶ 43    Second, Cain's account of being attacked inside her car is hard to square with the other evidence before the court. Recall that, according to Cain, Moneyham was sitting in the seat directly behind the driver's seat and that, without provocation, he grabbed her by the throat from behind. But the evidence showed that, after getting out of her car, Cain did not flee to safety or immediately seek assistance. Instead, she walked to the back door and opened it, thereby exposing herself to the man who, according to her testimony, had just violently attacked her. Despite testifying that Moneyham was sitting on the driver's side of the car, the evidence shows that Cain not only confronted him on the passenger side but, as seen in the security footage, actually found Moneyham sitting on the passenger side when she opened the back door. Furthermore, after Cain opened the door and found Moneyham sitting there, neither he nor she moved as if they anticipated a physical altercation. To the contrary, despite testifying that Moneyham had, only seconds earlier, grabbed her throat from behind and started choking her, Cain left the door open and *turned her back on him* so she could go get the attention of her colleagues. And when she returned to the car—where, incidentally, her alleged attacker remained seated, having made no effort to chase her or to run away—she did not wait for help to arrive before grabbing Moneyham and trying to pull

him out of her car. To reconcile Cain's account with these indisputable facts shown by the evidence, the trier of fact would have to believe that, despite just being violently attacked by somebody who was sitting on the driver's side of the car, Cain (1) decided to confront her attacker rather than summon aid or flee to the safety of the hospital; (2) looked for him on the wrong side of the car; (3) *found* him on the wrong side of the car, which would mean that Moneyham had changed sides; (4) exposed herself to yet another attack from behind by opening the door and then walking away; and (5) felt no need to wait for the assistance she summoned before voluntarily initiating a new physical altercation with him.

¶ 44  Again, it is of course conceivable that Cain did these things despite having just been attacked inside her car. But a reasonable trier of fact could not fail to recognize that the simplest explanation for these undisputed facts is that no attack occurred. If Cain merely saw Moneyham in her back seat, that would explain why she did not immediately flee to safety or summon aid (because she did not perceive him as a significant threat), why she went around to the passenger side (because she knew he was there), why she only went to get help after opening the door (because he was not getting out on his own), why she turned her back on him (because she did not think he would attack her), and why she started trying to pull him out on her own before help arrived (because, again, she did not perceive Moneyham as a threat). Accordingly, when evaluating Cain's credibility, the trier of fact had to consider that accepting her account would mean rejecting the most plausible explanation for the other facts in evidence.

¶ 45  Cain's account of being suddenly choked from behind is also seemingly inconsistent with Moneyham's behavior both before and after the alleged attack. Cain herself testified that, when he was in the hospital waiting room, Moneyham's demeanor was sleepy and nonresponsive, and he

did not resist being escorted out of the hospital. Consistent with this description, the security footage depicted Moneyham slumped over in the back seat only seconds after the alleged attack took place. He did not attack Cain, either when she opened the rear passenger-side door, when she returned after alerting her fellow guards, or even when she heaved his upper body onto the concrete sidewalk. Again according to Cain, while pulling Moneyham out of the car, she noticed that he had defecated on himself and that some of the feces had smeared in her back seat. Meanwhile, the only action Moneyham can be seen taking during this time was sitting up a bit straighter while Cain walked off to get help. To accept Cain's testimony, the trier of fact would have to believe that this passive, lethargic, and apparently incontinent man had suddenly grabbed and choked Cain from behind. Once again, that is not impossible, but it is not particularly likely.

¶ 46    Third, because the video did not capture what transpired inside the car, it could not directly contradict Cain's account of what happened during the alleged attack (nor could it corroborate her account). It did, however, repeatedly contradict Cain's testimony about what happened next. Cain testified that, when she opened the back passenger-side door, Moneyham was still sitting behind the driver's seat. The video shows that he was actually on the passenger's side. Cain testified that, after opening the door and before she left to get the other guards' attention, she and Moneyham tussled in her back seat. The video shows that she did not physically engage with him until she returned from summoning aid. Cain testified that, when she tried to pull Moneyham out of her car, he pushed or kicked her, using his legs to keep her at bay. The video shows that she pulled him out headfirst, giving him no opportunity to kick at her. Notably, had this testimony been true, it would have to supported her claim that she was attacked inside the car. Had Moneyham actually been seated on the driver's side when she opened the door, that would have corroborated her

testimony that he grabbed her from behind. Similarly, had Moneyham engaged in the combative behavior she described, that would have corroborated her testimony that he had, seconds earlier, attacked her. The natural inference was that she was trying to sell a story. These inaccurate assertions of fact, moreover, did not involve matters that were minor or collateral. The video contradicted basic facts about what Cain claimed happened. It showed that Cain's testimony about the portion of the incident that took place after she got out of the car was not credible. That calls into question the credibility of her entire account, including what happened inside the car. See *People v. Herman*, 407 Ill. App. 3d 688, 707 (2011) (finding that significant inconsistencies in witness's testimony called into question the credibility of her testimony as a whole).

¶ 47    So, there were three significant reasons to doubt Cain's testimony that Moneyham attacked her: it was implausible that what she described happened in less than two seconds, accepting her account meant rejecting what would otherwise be a better explanation for the other evidence, and she had provided testimony about other parts of the incident that was demonstrably untrue, including a claim that Moneyham was kicking at her. And, crucially, the record is devoid of evidence corroborating Cain's testimony that Moneyham attacked her. A lack of corroboration is not necessarily fatal to a witness's testimony. Still, otherwise dubious testimony can be bolstered through objective corroboration. Here, there was none. The trier of fact had to assess whether Cain's account proved Moneyham's guilt beyond a reasonable doubt entirely on its own. Furthermore, it should be considered that Cain's testimony might have been influenced by the fact that Moneyham soiled her vehicle. Appellate courts should address potential bias where applicable.

¶ 48   Once more, the rule is that a single witness's testimony can be sufficient to sustain a conviction, but only if it is positive and credible. *Gray*, 2017 IL 120958, ¶ 37. But no witness's testimony can be assessed in isolation. Just as the trier of fact must consider all evidence put before it, we must consider the entire body of evidence presented at trial—even when that evidence is not favorable to the State's theory. *People v. Wheeler*, 226 Ill. 2d 92, 117 (2007). And the other evidence in this case repeatedly calls into question the credibility of Cain's account of what happened inside her car. To accept Cain's testimony that Moneyham attacked her as true beyond a reasonable doubt, a trier of fact would have to credit a dubious account that was a poor fit for the other evidence in the case given by a witness whose testimony on other significant points was contrary to what was objectively shown on video. When viewed in the light most favorable to the State, a rational trier of fact could, at best, infer that Cain's claim that Moneyham grabbed her throat and started choking her might be true but remained opened to question. See *Cunningham*, 212 Ill. 2d at 281-82. And as that is the best available reasonable inference permitted by the record, no rational trier of fact could reach the "subjective state of near certitude" required by the standard of proof beyond a reasonable doubt. *Jackson*, 443 U.S. at 315. The evidence presented was not sufficient to sustain the finding of guilt.

¶ 49   The evidence of record also raises a serious question about Moneyham's state of mind. Cain herself testified that Moneyham's behavior was abnormal, and Moneyham testified that he had no recollection of the incident, only a handful of moments before and after it. Cain's testimony also showed that he defecated on himself while in her car. And the entire reason Moneyham was there at the hospital, of course, was for a psychiatric evaluation—one that did not occur because he did not fill out paperwork. In summary, Moneyham was taken to the hospital based on behavior

indicative of him experiencing a mental-health crisis. Rather than the treatment he clearly needed, he was arrested, convicted of a felony, and sentenced to four years of imprisonment.

¶ 50    The primary objective of the appellate process in criminal cases is to prevent incorrect verdicts and, notably, to protect against the wrongful convictions of innocent individuals. I contend that the State has failed to meet its burden of proof beyond a reasonable doubt.

¶ 51    Because I would have reversed the conviction, I respectfully dissent.